# United States Court of Appeals
## For the First Circuit

No. 16-2343

LUIS ROJAS-BUSCAGLIA; INART CORP.; INART SERVICES, INC.,

Plaintiffs, Appellees,

v.

MICHELE TABURNO-VASARHELYI,
a/k/a Michele Taburno-Vasarely,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Selya, and Kayatta,
Circuit Judges.

Lydia M. Ramos Cruz for appellant.
David A. Carrión Baralt for appellees.

July 24, 2018

**TORRUELLA**, **Circuit Judge**.  Following a lengthy bench trial, the district court entered judgment for Michele Taburno-Vasarhelyi ("Vasarely")[1] on several of her counterclaims against her business partner, Luis Rojas-Buscaglia ("Rojas"),[2] awarded her over $400,000 in damages, ordered her to provide Rojas certificates of authenticity for two disputed pieces of artwork, and dismissed several of her remaining counterclaims.  Unsatisfied with this result, Vasarely sought our assistance.  Finding no error in the district court's rationale, we affirm the district court's judgment.

## I. BACKGROUND

### A. Factual Background

We begin with the relevant facts, reciting them as they relate to the issues presented on appeal.  Vasarely, daughter-in-law of deceased "Op Art" artist Victor Vasarely, and widow of Victor's son, Jean Pierre Vasarely (better known as "Yvaral"), accumulated a large and valuable artwork collection as a result of her relationship with both artists.  Rojas, a Puerto

---

[1]  Also known as Michele Taburno-Vasarely.  Throughout the proceedings below and in her appellate brief, our appellant refers to herself as "Vasarely."  Accordingly, we do the same.

[2]  For ease in exposition, and because the other plaintiffs in the underlying case, Inart Corporation and Inart Services, are wholly owned and controlled by Rojas we refer to plaintiffs, collectively, as "Rojas."

Rican entrepreneur and art dealer, and widower of Vasarely's best friend, moved to France in December 2000 to work as Yvaral and Vasarely's assistant. Yvaral died in August 2002.

From 1981 to 1985, Rojas's father, Dr. Luis Rojas ("Dr. Rojas"), purchased eleven Victor Vasarely paintings from a gallery in Venezuela. Among the works he bought were: *Grilles-II*, *Helios-Neg*, *Tridim-S*, and *Tsoda.* Dr. Rojas gave Rojas custody of the works of art along with the right to sell or exchange them in his father's name. In September 2002, Rojas consigned the works of art to Vasarely for exhibit or possible sale.

### 1. The 2009 Settlement Agreement

In 2004, Vasarely and Rojas moved to Chicago and acquired what, according to Rojas's allegations, was community property shared between the two of them. After their relationship took a negative turn, Rojas moved back to Puerto Rico in 2005. At some point between 2005 and 2009, Vasarely alleged that Rojas and his father had sold some of her artwork to a private party, Dr. Fernando Zalduondo, but never paid Vasarely for the sale. On February 5, 2009, Vasarely and Rojas signed a settlement agreement (the "2009 Settlement Agreement") stating that Rojas would give nine of Dr. Rojas's paintings, including *Grilles II*,[3] *Helios-Neg*,

---

[3] While the 2009 Settlement Agreement lists the name of this painting as *Guilles*, it is clear from the record and the parties'

-3-

*Tridim-S* and *Tsoda*, to Vasarely as payment for the sale to Dr. Zalduondo.

## 2. The Chicago Agreement

From 2008 to 2012, Vasarely was involved in a civil lawsuit in the Circuit Court of Cook County, Illinois, against an art gallerist, Thomas Monahan, during which the Cook County court attached hundreds of works of art that Vasarely had in storage in Chicago. This included three pieces of artwork listed in the 2009 Settlement Agreement: *Grilles II, Tridim-S, and Tsoda.* On January 20, 2009, Vasarely wrote to Dr. Rojas that she regretted the situation and that she hoped his seized works would be returned to him in March or April. On September 22, 2010, Dr. Rojas and Vasarely signed an agreement (the "Chicago Agreement"), in which Vasarely recognized that Dr. Rojas was the owner of these paintings, as well as *Helios-Neg*.

## 3. The 2010 Artwork Agreement

In June 2009, Rojas sued Vasarely for the division of their community property. On September 22, 2010, Rojas and Vasarely settled their community property dispute by entering into an agreement (the "2010 Artwork Agreement") pursuant to which Rojas, as the sole owner, director, and officer of Inart

---

briefs that this is the same painting as *Grilles II.*

-4-

Corporation and Inart Services, would earn commissions by selling Vasarely's artwork to Inart's clients. According to the agreement, Vasarely would receive eighty percent of the sale price and Inart would receive the other twenty percent. Appendix A of the 2010 Artwork Agreement listed eleven paintings and three sculptures, which Vasarely gave to Inart on consignment. Pursuant to Clause 8 of the 2010 Artwork Agreement, after the consigned artwork was sold and Vasarely received her share of the payment, she was to deliver the sold artwork's certificate of authenticity to the purchaser. Clause 11 provided that either Rojas or Vasarely was entitled to terminate the agreement with eight days' notice for reasonable cause or for a breach of the contract by the other party. Upon termination, Clause 12 established that Inart had to return all artworks to Vasarely within forty-eight hours by depositing them in a storage facility of Vasarely's choice. If the forty-eight hours passed without Inart returning the artwork, Inart would be fined $1,000 per day payable to Vasarely.

### 4. Verbal Agreement: *Pompari* and *Quasar-Zett*

The parties restored their working relationship and, in December 2011, Vasarely and Rojas verbally agreed that Rojas would travel to Paris for five days to complete some tasks for her. Pursuant to her instructions, Rojas found several pieces of artwork in storage facilities that Vasarely maintained in France, prepared

the artwork to be shipped to Puerto Rico -- where Vasarely was contemplating moving -- contacted a shipping company to relay Vasarely's specific moving instructions, and supervised the move. As compensation for his work, Vasarely agreed to give Rojas two pieces of artwork, *Pompari* and *Quasar-Zett*, together valued between $240,000 and $300,000, as well as their certificates of authenticity. Rojas received the artwork after the items arrived in Puerto Rico, but Vasarely did not provide him the certificates of authenticity.

### 5. Shipment of Vasarely's belongings from Chicago

In late October 2012, Vasarely moved from Chicago to Puerto Rico. At Vasarely's request, Rojas agreed to take care of the shipment of Vasarely's belongings and hired a company to pack and ship the items located in her condo and four storage warehouses in Chicago. Vasarely oversaw a representative from the shipping company, Bill Mamer, as he packed her things in the condo, and she put Rojas in charge of overseeing the packing of her items in the warehouses. Vasarely did not create an inventory of the items from the warehouses that were placed into each of the six shipping containers and did not ask Rojas to do so either. The shipping company prepared lists with very general descriptions of the contents packed in each of the containers, which held hundreds of boxes in total. Contrary to her instructions to ship the

-6-

containers and lease storage units in Puerto Rico under her name, Rojas used either his name (or various misspellings of his name) or his companies' names for the shipping and leasing agreements. Five of the containers arrived in Puerto Rico on different dates between September 19 and December 20, 2012, where Rojas received them and, with the help of two hired assistants, unloaded them at either the storage facility or at the building where he and Vasarely both lived. The sixth container was sent to a storage facility in New Jersey, purportedly with Vasarely's knowledge, because Rojas believed not all of the boxes would fit into Vasarely's Puerto Rico apartment. This New Jersey storage is also where Vasarely stored items that she purchased at auction, and the plan was to keep the shipped items there until she had room in Puerto Rico for the container and auctioned items. Vasarely received the container in Puerto Rico in June 2013. Vasarely now contends that many of her possessions, including a number of valuable works of art, are missing and were lost or stolen either in transit or upon arrival in Puerto Rico.

### 6. Sale of the Chicago condominium

In 2003-04, when Vasarely moved from France to the United States, Vasarely and Rojas purchased a condominium in Chicago under Rojas's name for $1,160,000. Subsequent renovations to the condominium cost approximately $250,000. On September 3, 2010,

Rojas and Vasarely signed a "Memorandum of Note" stating that Vasarely would receive the proceeds of the sale of that condominium when it was sold. In November 2010, Vasarely put the condominium up for sale and, because she felt that the $1,100,000 offer she received was too low,[4] she took the property off the market. After Vasarely moved to Puerto Rico in October 2012, Rojas hired a realtor and recommended that Vasarely sell the condominium for $1,100,000. Vasarely still felt that this amount was too low and said that an appraisal needed to be done to know the true market value of the property. On April 15, 2013, Rojas sold the condominium without an appraisal for $1,075,000.

## 7. Vasarely's demands for return of her artwork

Because she suspected that Rojas was taking artwork from her storage unit without her permission, on March 14, 2013, Vasarely emailed Rojas requesting that he give her the keys to the Puerto Rico storage units and a list of artwork that he had taken. Rojas did not answer. On April 7, 2013, Vasarely sent Rojas an email that, after addressing personal matters, stated, "I no longer want to work with you, you don't do anything, other than abuse me and take away my fortune by [f]orce." On May 16, 2013, Vasarely wrote to Rojas: "If tomorrow prior to my leaving at one, all of my

---

[4] Rojas remembered an additional offer for $950,000.

works of art have not arrived, I forewarn you that we are going to file a complaint in court and of course I am going to cancel all pending projects." The next day, she wrote in another email, "[w]e are not going to have any business until everything is clarified with attorneys and all my works of art are in my possession." Between May and October 2013, she wrote Rojas several emails requesting that he return all of the artwork that he took from her storage units, as well as the keys to those storage units, but Rojas nevertheless continued to ignore her repeated requests. Rojas did not return the artwork or keys to Vasarely until February 2014 after the district court ordered him to do so on January 30, 2014. The set of artwork, consisting of at least thirty-one works, was worth between $3,000,000 and $10,000,000.

## B. Procedural Posture

### 1. Complaint and Counterclaims

On October 9, 2013, Rojas filed suit in the United States District Court for the District of Puerto Rico, claiming inter alia that Vasarely breached the 2010 Artwork Agreement by reducing Rojas's commissions, interfering with artwork sales, and delaying providing the purchasers certificates of authenticity for the artwork. Rojas further sought injunctive relief and urged the district court to order Vasarely to produce the certificates of authenticity for the paintings already sold, as well as for *Pompari*

and *Quasar-Zett*.  Finally, Rojas alleged that Vasarely defamed him and his companies, causing damage to their commercial reputation.

On November 14, 2013, Vasarely asserted numerous counterclaims; those relevant to this proceeding we discuss below. Vasarely counterclaimed that Rojas breached the 2010 Artwork Agreement by refusing to give her proceeds from certain artwork sales, entering into her property and removing artwork and her personal belongings, and refusing to return artwork after she terminated the 2010 Artwork Agreement.  She next counterclaimed that Rojas breached a "mandate contract" when he failed to follow her instructions regarding the shipment of her belongings from Chicago to Puerto Rico, and breached a consignment contract when he leased the storage units in Puerto Rico under his name and failed to return to her the items that she deposited.  Vasarely also claimed Rojas was liable for the unauthorized sale of her condo in Chicago, and for the proceeds of the sale for not proving that he had paid her in full.  She further requested damages for mental and moral anguish suffered due to Rojas's "purposeful, illegal, mean and disloyal acts" towards her.

On November 22, 2013, and again on July 2, 2014, Vasarely moved to replevy several works of art, including the *Pompari, Quasar-Zett, Grilles-II, Helios-Neg, Tridim-S, and Tsoda*

paintings, and other belongings that she alleged that Rojas illegally possessed. The district court denied both motions.

## 2. Motions for Partial Summary Judgment

On January 30, 2015, Vasarely filed a motion for partial summary judgment, requesting that the court grant judgment in her favor on her counterclaims related to the breach of the 2010 Artwork Agreement and the sale of the Chicago condo, and that it dismiss all of Rojas's claims. She again urged the district court to order Rojas to return the artwork in their possession. On the same day, Rojas filed a motion for partial summary judgment, requesting that the court dismiss Vasarely's breach of the consignment contract claim and her request for replevin of the artworks, with the exception of *La Bergere*, *Quasar-Zett* and *Pompari*.

The district court denied Rojas's motion for partial summary judgment in its entirety and granted in part and denied in part Vasarely's motion for partial summary judgment. Specifically, as is relevant to this appeal, the district court: 1) granted judgment in Vasarely's favor as to her counterclaims that Rojas breached the 2010 Artwork Agreement by failing to provide her proceeds from the sale of several pieces of artwork; 2) denied her request for judgment as to her counterclaim that Rojas breached the 2010 Artwork Agreement by not returning her

-11-

artwork; 3) denied her motion for summary judgment on Rojas's claim that Vasarely breached the 2010 Artwork Agreement; and 4) granted in part and denied in part her motion for summary judgment as to her counterclaim regarding the sale of the Chicago condominium. As to the condominium counterclaim, the district court found that Rojas had not provided Vasarely the full net proceeds from the sale of the Chicago condominium, but denied Vasarely judgment as to her claim that Rojas negligently and in bad faith undersold the condominium by not first obtaining an appraisal.

## 3. **The Trial**

On August 10, 2015, the district court commenced a nineteen-day bench trial on the remaining claims. After hearing the testimony of nine witnesses and reviewing the 252 exhibits admitted into evidence, on August 5, 2016, the district court dismissed the remainder of Rojas's claims that Vasarely breached the 2010 Artwork Agreement as well as Rojas's defamation claim. The district court did, however, find in Rojas's[5] favor as to his request for injunctive relief as to the *Pompari* and *Quasar-Zett* paintings, finding that Vasarely gave them to Rojas in exchange for his work in Paris, and ordered Vasarely to provide Rojas the respective certificates of authenticity.

---

[5] Rojas brought this claim individually, apart from the other plaintiffs in the underlying case.

-12-

As to Vasarely's remaining counterclaims, the district court found in Vasarely's favor on her counterclaims for breach of contract relating to the sale of several pieces of artwork and awarded her further damages in addition to those already awarded at summary judgment. As to Vasarely's counterclaim for damages for Rojas's breach of the 2010 Artwork Agreement by failing to return her artwork in a timely manner, the district court found that Vasarely had provided sufficient notice of her intent to terminate the agreement and that a penalty pursuant to the agreement's penalty clause was warranted. The court dismissed Vasarely's counterclaim that Rojas breached the contract by keeping an unauthorized inventory as it found that Rojas eventually returned the artwork, and that Vasarely failed to show any damages -- outside of those warranted by the contract's penalty clause -- from the delayed return of the art.

Next, the district court dismissed Vasarely's counterclaim that Rojas breached an agency contract[6] and also dismissed Vasarely's breach of depositum contract counterclaim.[7] As to the sale of the condominium in Chicago, the district court

---

[6] This claim was labeled a breach of a "mandate contract" in Vasarely's counterclaims.

[7] This claim was labeled a breach of a "consignment contract" in Vasarely's counterclaims.

-13-

found that Vasarely did not present any evidence that Rojas sold the condo for less than it was worth, and thus dismissed her counterclaim that Rojas negligently and in bad faith undersold the property. The district court did, however, find in Vasarely's favor on her tort counterclaim for mental anguish and ordered Rojas to pay her $5,000.

Lastly, the district court dismissed Vasarely's replevin requests as to *Quasar-Zett*, *Pompari*, *Grilles-II, Helios-Neg, Tridim-S, and Tsoda*. The district court found that Vasarely gave the first two paintings to Rojas as payment for work that he did for her in Paris, and thus, because she does not own the paintings, her motion for replevin must fail.[8] As for the latter four paintings, the district court found that they belonged to Dr. Rojas pursuant to the Chicago Agreement.

The district court denied Vasarely's motion for reconsideration on September 20, 2016. On October 19, 2016, Vasarely timely appealed, which leads us to the following.

## II. DISCUSSION

Vasarely raises a number of issues on appeal, which we will handle in turn. Because the facts and application of the law

---

[8] Rojas had physical possession of the paintings until the district court ordered him to deposit them in a storage warehouse.

are largely disputed by the parties, we begin with the standard by which we review the issues presented in this appeal.

## A. Standard of Review

Following a bench trial, this Court reviews the district court's findings of fact with deference, overturning them only when clearly erroneous, but review "its legal conclusions de novo." Portland Pilots, Inc. v. NOVA STAR M/V, 875 F.3d 38, 43 (1st Cir. 2017) (quoting Ne. Drilling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 37 (1st Cir. 2001)). This Court will overturn a finding of fact "only if it 'hit[s] us as more than probably wrong -- it must prompt a strong, unyielding belief, based on the whole of the record, that the judge made a mistake.'" Sánchez-Londoño v. González, 752 F.3d 533, 539 (1st Cir. 2014) (alteration in original) (quoting Darín v. Olivero-Huffman, 746 F.3d 1, 8-9 (1st Cir. 2014)).

The applicable standard of review for an award of damages, and for the modification of a penalty clause, is for an abuse of discretion. See Lawton v. Nyman, 327 F.3d 30, 37 (1st Cir. 2003) (stating that the abuse of discretion standard of review applies to damages awards); see also Lussier v. Runyon, 50 F.3d 1103, 1111 (1st Cir. 1995). Under this framework, an appellant must convince this Court that the district court "committed a meaningful error in judgment." Lussier, 50 F.3d at 1111 (quoting

Rosario–Torres v. Hernandez–Colon, 889 F.2d 314, 323 (1st Cir. 1989)) (internal quotation marks omitted).

## B. The Contested Issues

With these standards in mind, we turn to Vasarely's claims.

### 1. Agency and depositum contracts

Vasarely argues that the district court disregarded circumstantial evidence showing that Rojas had breached both an agency and depositum agreement, and therefore was liable for the disappearance of fifty-seven items belonging to her. We begin with her claim for breach of the agency contract before moving on to her claims regarding the depositum contract.

#### a. Agency contract

The district court found that Vasarely and Rojas formed an agency contract under which Rojas would hire a company to pack Vasarely's belongings, lease storage units in Puerto Rico, and unload and store those belongings once in Puerto Rico. Vasarely does not challenge this characterization, but instead disagrees with the district court's conclusions that 1) Rojas's only breach of the agency contract was his failure to follow Vasarely's instructions by shipping her items from Chicago to Puerto Rico and leasing storage units under his name or the name of his companies, and 2) that Vasarely did not show any loss from Rojas's breach.

Instead, she argues that "the district court discarded much [circumstantial evidence] as 'gossip'" and erroneously failed to apply a presumption that Rojas was at fault for her purportedly lost items as they were last in his custody.

Pursuant to Puerto Rico law, under which Vasarely's counterclaims were brought, an agency contract is formed when a person "binds himself to render some service . . . for the account or at the request of another." P.R. Laws Ann. tit. 31, § 4421. The agent must follow the instructions of the principal in fulfilling his obligations. Id. at § 4442. Moreover, the agent will be "liable for the losses and damages caused to the principal through his noncompliance." Id. at § 4441.

There is no question that, at her request, Rojas hired a moving company to pack and ship Vasarely's belongings from Chicago to Puerto Rico. According to Vasarely's own testimony at trial, at the time that she decided to make this move, she was too exhausted from her court cases to make arrangements for her items to be packed and shipped, and therefore Rojas agreed to -- and did -- hire movers to take care of that work. She acknowledges that she oversaw the packing of the items in her Chicago apartment, and that Rojas oversaw the movers who packed the items in the Chicago warehouses. But, other than her bald allegations that items went missing, she fails to point to any evidence that Rojas did not

follow her instructions to pack the items in her Chicago storage units. The record even shows that Rojas requested that Vasarely's shipment be handled with care and asked for protective coverings for the shipping containers. And, despite her testimony to the contrary, there was plenty of evidence that Vasarely was able to, and in fact did, communicate with at least two of the supervisors of the moving company and was involved in planning the details of the move. Therefore, as it relates to Rojas hiring a company to pack and move Vasarely's belongings, the district court did not clearly err in finding that Rojas complied with Vasarely's instructions in all respect aside from using the incorrect name(s) to do so.

The parties don't dispute that Rojas leased storage units in the AAA Mini Almacenes storages in Puerto Rico for Vasarely's belongings, but again did so in the wrong name. The record shows that Rojas did unload the items that were shipped to Puerto Rico, with the assistance of two helpers and stored them either at the La Cima condominium facility -- where both of the parties lived -- or in the leased storage units. Given the support in the record, and our deference to the district court's credibility determinations, see Sawyer Bros., Inc. v. Island Transporter, LLC, 887 F.3d 23, 31 (1st Cir. 2018) ("We have repeatedly said that 'in a bench trial, credibility calls are for

-18-

the trier.'" (quoting <u>Carr</u> v. <u>PMS Fishing Corp.</u>, 191 F.3d 1, 7 (1st Cir. 1999))), we find no clear error in the district court's finding that Rojas's only breach of the agency contract was Rojas's improper use of his and his companies' names for the shipments from Chicago and leasing of storage units in Puerto Rico.

Further, the district court did not clearly err in finding that Vasarely did not show any damages from Rojas's uses of the wrong names for shipping and leasing purposes. While Vasarely alleges that numerous items are missing or are lost, Vasarely provided no evidence from which the district court could conclude that these alleged losses were a result of the use of the wrong name, or that, as she claims, "this is a theft case." Vasarely acknowledges that the containers arrived in Puerto Rico with the seals unbroken, proving that nothing was stolen en route, and that Rojas had people help unload those shipping containers. She alleges that Rojas sent a container to New Jersey without her knowledge, but based on the testimonies of both Rojas and Vasarely, the district court was justified in finding that Vasarely knew and agreed to ship one container to New Jersey for storage until she moved into a larger apartment in Puerto Rico. The evidence also shows that she eventually received this sixth container in Puerto Rico. And, although she protests otherwise, there was also evidence to support the conclusion that she had access to those

storage units in Puerto Rico.  Therefore, we find no clear error in the district court's finding that Vasarely failed to show any loss from the non-compliance.

As to her legal challenge, the district court applied the correct legal standard for a breach of agency contract and properly applied the law to these record-supported facts.  As this was Vasarely's counterclaim, it was her burden to show a loss from Rojas's noncompliance, and not Rojas's burden to prove a negative -- that he was not at fault for purportedly lost items.  Cf. Dir. Office of Workers' Comp. Programs, Dept. of Labor v. Greenwich Collieries, 512 U.S. 267, 272-76 (1994) (party bearing the "burden of proof" -- that is, the party seeking the award -- has the "burden of persuasion").  As just mentioned, a proper application of the law shows that because Vasarely failed to show any loss caused by the use of improper names to ship or store her items, the district court properly dismissed this breach of agency contract claim.

**b. Depositum Contract**

The district court dismissed Vasarely's breach of depositum contract counterclaim because, although Rojas received five of the containers in Puerto Rico, Vasarely failed to show that the purportedly missing items were in any of those containers as she never inventoried the containers' contents.  Vasarely argues

that because Rojas admitted to removing some artwork from the storages in Puerto Rico without her authorization, the burden of proof shifted to him to show that all of the allegedly "missing" artwork was not in his possession.

While Vasarely is correct that a depositary is liable for items in his or her control under a depositum agreement, the burden is on the party alleging the breach, as the one claiming to have made such a deposit, to first show that the missing items were in fact deposited with the depositary. See P.R. Laws Ann. tit. 31, §§ 3192, 4661; see also Díaz Ayala v. E.L.A., 153 P.R. Offic. Trans. 675, 697 (P.R. 2001) (stating that, under Puerto Rico law, the burden of proof rests on the one claiming the affirmative of the issue); P.R. R. Evid. 110(B).

We find no clear error in the district court's finding that Vasarely did not present probative evidence of what exactly was in those five containers that Rojas received in Puerto Rico or whether those five containers contained the specific items that she alleges are missing. As is evidenced by the record, some of Vasarely's items were still in storage in Chicago, some still in Paris, and some in storage in New Jersey. When Vasarely was shown exhibits during trial, she was unable to specify how many pieces of the artwork shown were missing because they may have been in storage and admitted that she was not present when the shippers

packed the artwork in the Chicago storage facility. Further, the district court found credible Rojas's testimony that he only removed the artwork that belonged to his father, the artwork pending sale, and the artwork given to him as payment for the tasks he performed for Vasarely in Paris. The district court also found that Rojas returned the rest of the "unauthorized inventory" when the court so ordered.

Vasarely claims that the district court "modified the Civil Code" by requiring that she have an inventory in order to show that these allegedly missing items were received by Rojas. But, Vasarely mischaracterizes the nature of the district court's findings. The district court did not find that a breach of a depositum contract cannot be proven without an inventory; instead, it required that Vasarely meet her burden of proving which items she deposited with Rojas. Without some method of proving what items Rojas received -- whether that be an inventory, a receipt, or some other proof -- Vasarely simply did not fulfill her requirement to show a breach of depositum contract claim.

In response, Vasarely points out that she had an inventory of all of her artwork, and that she specifically inventoried the artwork that was packed in the Chicago condominium under her supervision. She further draws the court's attention to the inventory of artwork that was prepared by the Cook County court

while her paintings were in its custody.  But, again, she does not show which pieces of artwork were put into the containers deposited with Rojas.  The fact that she may have had a general inventory of all of her artwork at some unspecified time, and that the Cook County court made an inventory of the artwork in its possession during prior litigation, does not prove which items were specifically packed in those five containers that Rojas received in Puerto Rico.  Although Vasarely claims that Rojas should bear the fault for failing to inventory the artwork from the Chicago storages going into the five containers, the district court did not clearly err in finding that she did not ask Rojas to prepare such an inventory.

As Vasarely failed to prove what items she deposited with Rojas, we cannot find that the district court clearly erred in its conclusion that she had failed to prove her breach of depositum contract claim.

## 2. Motions for writ of replevin

Next, Vasarely alleges that, by denying her motions for writ of replevin, the district court "validated the theft of Vasarely's artwork."  She specifically points to six pieces of artwork that were not returned to her, claiming that the court "failed to see that the[y were] removed under . . . false excuses."

### a. *Pompari* and *Quasar-Zett*

Vasarely challenges the district court's conclusion that she gave Rojas these two artworks as payment for completing tasks on her behalf in Paris, claiming there to be no evidence to support this finding. She instead contends that the evidence shows that Rojas went to Paris for his own purposes and then, after taking the paintings without authorization, made up this story as an afterthought. But this was a factual finding based on the district court's credibility determinations, and is supported by the record. It is not clearly erroneous.

The district court heard Vasarely's and Rojas's testimonies and found Rojas's testimony that Vasarely agreed to give him these paintings to be the more credible of the two. The "[d]istrict court determinations of credibility are . . . entitled to great deference." Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009). The district court could have reasonably concluded that, while extravagant, Vasarely gave Rojas the paintings in exchange for supervising a complex move that took approximately five days to complete. The record contains emails between Vasarely, Rojas, and the movers in France, in which Vasarely warns Rojas to be extremely careful with the moving of the paintings as "the price to pay for [] mistakes are, generally, very heavy." In these emails, Rojas inquires about the process of the move and

discusses its cost with the movers. Rojas testified, and the court believed, that he had to locate and ship several dozen paintings amongst the hundreds of valuable paintings in storage, had to coordinate with a shipping company to move hundreds of paintings from one storage facility to another, and did various other errands for Vasarely while he was in France. Even if Rojas went to Paris on his own accord, as Vasarely claims, this does not preclude an agreement between the parties regarding payment for work performed while he was there.

Pursuant to Puerto Rico law, verbal contracts are valid and enforceable. See P.R. Laws Ann. tit. 31, § 3451. Based on the district court's finding, there was a verbal agreement between the parties that Vasarely would give Rojas these paintings and their certificates of authenticity in exchange for his work on her behalf in Paris. Therefore, despite the lack of a written contract, the district court did not err in finding the verbal agreement between the two parties was binding and that *Pompari* and *Quasar-Zett* belonged to Rojas. And, because a petitioner must prove that they own an item in order to recover it through replevin, see id. at §§ 1111, 1479, and Vasarely failed to prove that she owned *Pompari* and *Quasar-Zett* at the critical time, the district court properly denied her motions for writ of replevin as to these two paintings.

-25-

### b. *Grilles-II*, *Helios-Neg*, *Tridim-S*, and *Tsoda*

Vasarely avers that the district court improperly found the 2009 Settlement Agreement, in which Rojas gave these paintings to Vasarely, to be invalid, while erroneously enforcing the Chicago Agreement, in which she recognized that Dr. Rojas was the true owner of the paintings. She claims that the district court's rejection of the validity of the 2009 Settlement Agreement was contrary to the Puerto Rico Civil Code. Meanwhile, the Chicago Agreement, she says, was never meant to transfer ownership of these paintings to Dr. Rojas, but instead was created to allow him to intervene falsely in the Chicago litigation to remove the artwork from the court's custody. Therefore, she offers, because the Chicago Agreement was a "simulated agreement" used for "illicit purposes," it is void.

Although the district court did question the legitimacy of the 2009 Settlement Agreement, it did not reject the agreement's validity, as Vasarely claims it did. Rather, the district court assumed the validity of the agreement but found that it had been superseded by the Chicago Agreement. There was no error in this conclusion. The Chicago Agreement complies in all respects with the Puerto Rico Civil Code's requirements for a valid contract. See P.R. Laws Ann. tit. 31, § 3391. The district court's disbelief of Vasarely's story regarding the illicit purpose of the Chicago

Agreement is supported by the evidence, including Dr. Rojas's testimony, as well as a letter that Vasarely wrote to Dr. Rojas months before the Chicago Agreement was signed recognizing him as the owner of the paintings. Likewise, the Chicago Agreement clearly stated that Dr. Rojas was the owner of such paintings.

Further, the district court did not clearly err in concluding that the Chicago Agreement, signed on September 22, 2010 superseded the 2009 Settlement Agreement. Vasarely failed to present any evidence showing that she acquired title to the paintings after the Chicago Agreement was signed. The district court rightly weighed this against Vasarely's claim that she is the owner of the paintings and found that she had transferred ownership of those paintings back to Dr. Rojas. Therefore, as with *Pompari* and *Quasar-Zett*, Vasarely could not replevy artwork belonging to someone else. There was no error in the district court's denial of her motions for writ of replevin.

### 3. The Chicago condominium

Marching on, Vasarely claims that the district court's dismissal of her breach of contract counterclaim was erroneous, and that the court improperly imposed on her the burden to prove the exact loss or damage she suffered due to Rojas's sale of the Chicago condominium without an appraisal. Instead, she argues, because Rojas was the one who sold the property, and because he

"departed from the ordinary course of business in not obtaining an appraisal," the burden should have been placed on Rojas to prove his assertion that he sold the condominium at an adequate price. By placing the burden on her, says Vasarely, the district court required her to prove something -- the value of the real estate -- that was impossible for her to prove because of Rojas's negligence in failing to get an appraisal. In addition, she maintains that the three years that elapsed between when she rejected the prior offers for being too low and when the condo was eventually sold is irrelevant, and what matters is that she was unwilling to sell for $1.1 million. Therefore, it was clear that she also would not have been willing to sell for the price at which Rojas sold it, $1.075 million, and his decision to do so denied her the right to sell her property at whatever price she deemed reasonable.

When a party is "guilty of fraud, negligence or delay" in complying with its contractual obligations, the aggrieved party is entitled to "losses and damages" caused by that fraud, negligence, or delay. P.R. Laws Ann. tit. 31, § 3018. However, the court will not assume fraud, and he or she who claims it must "establish its existence . . . by a preponderance of the evidence." Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 61 (1st Cir. 2011); see id. (citing González Cruz v. Quintana Cortés, 145 P.R.

Dec. 463, 471 (P.R. 1998) ("The general rule that fraud is not assumed only means that he who claims it must prove it to a reasonable certainty, that is, with a preponderance of evidence . . . .")).

Vasarely's argument that it was Rojas's burden to show that he had sold the condo at or above the market value presupposes a finding that Rojas's act of selling the condominium for $1.075 million was fraudulent and done in bad faith. Vasarely argued as much in her motion for partial summary judgment, but the district court supportably rejected summary disposition as to this issue. Thus, as this was Vasarely's breach of contract counterclaim, it remained her burden to prove by a preponderance of the evidence that Rojas had committed fraud in the sale of her condo without getting an appraisal. See id. Having failed to show any loss in not getting an appraisal, the district court was correct in dismissing her claim.

The record illustrates that Vasarely did not provide any evidence showing that Rojas had sold the condominium for below market value, resulting in a loss to Vasarely. Vasarely's only evidence that the property was undersold was the cost of the condominium and the estimated cost of renovations nearly a decade prior to the sale. However, as Vasarely concedes in her appellate brief, "the value of a piece of real estate is not necessarily

equal to its purchase price from a decade prior plus the value of its renovations."

Vasarely argues that there is no way that she could have met this burden, but does not state why she could not have presented other information aside from an appraisal to show an approximate value of the real estate at the time that it was sold. It would not have been difficult to provide comparable real estate data showing the price per square foot of similar condos in that area at the relevant time, and extrapolate from that information an approximate market value of the Chicago condominium. Cf. Sawyer Bros., 887 F.3d at 32 (stating that under maritime law "[c]ourts determine fair market value based on the price paid for comparable property on the open market"); Roberts v. City of Woonsocket, 575 F.2d 339, 341 (1st Cir. 1978) (finding witness appraisal of property that was subjected to city's amended zoning ordinance was "not supported by data of sales of any comparable property"); Bailey v. United States, 325 F.2d 571, 572 (1st Cir. 1963) ("Th[e] court is definitely committed to the proposition [that] . . . usually the best evidence of value is the prices at which comparable lands in the vicinity [are sold] . . . at about the time of the taking."). Instead, Vasarely relied on her claim that Rojas acted in bad faith by selling her property without an appraisal, period, but did not attempt to show any losses or

damages from the sale, as was required to prove her asserted breach of contract claim. See P.R. Laws Ann. tit. 31, § 3018. Given that Vasarely did not provide any evidence to substantiate her claimed loss of $335,000, the district court did not err in dismissing this counterclaim.

## 4. Contractual damages for delayed return of artwork

### a. Contract Termination Date

Clause 11 of the 2010 Artwork Agreement stated that either party could terminate the agreement for reasonable cause or for breach of contract with eight days' notice. The district court found that Vasarely had provided sufficient notice of her intent to terminate their agreement as a result of Rojas's breach on May 17, 2013, the date on which Vasarely wrote Rojas an email stating that, after months of asking him to return her artwork, the two were "not going to have any business until everything is clarified with attorneys and all my works of art are in my possession." Vasarely disagrees with the district court's finding as to the date that she gave sufficient notice of her intent to terminate the contract, instead claiming that she gave sufficient notice in her email to Rojas on April 7, 2013. She points to the district court's statement during trial that it "seems . . . pretty clear[] that she no longer wants to work with him" in relation to her April 7 email, in which she stated "I no longer

-31-

want to work with you."

While there is no specific legal requirement in Puerto Rico as to the manner in which an agreement must be terminated, generally, a notice of a contract termination "must be clear, definite, explicit, and unambiguous." Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) (applying Massachusetts law) (quoting Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 223 (1st Cir. 2004)). After hearing all of the testimony and viewing all of the evidence, and placing that evidence in the context of the relationship between the two parties, the district court's finding that the notice of contract termination was not sufficiently clear until May 17, 2013, is supported by the evidence in the record.

While Vasarely argues that she was perfectly clear when she stated that "I no longer want to work with you anymore" in her April 7, 2013 email, the district court also had before it a number of emails exchanged between the two parties before and after April 7, 2013, as well as Rojas's testimony that it was Vasarely's modus operandi to send emails such as this one periodically -- insulting him and his family and claiming that she no longer wanted to work with him -- yet continuing to work with him after the email was sent. Like those previous emails described by Rojas, the April 7, 2013 email from Vasarely consisted of repeated insults of

both Rojas and his wife, stating amongst other things that "without me, you are nothing," and that "[y]ou work 4 hours a day, 4 days a week, you slack off, you turn, you take care of the children and the home while madam spends, spends my money, goes out, has fun, . . . if it weren't so pathetic, it would be rather amusing." Rojas further testified that after receiving the April 7, 2013 email from Vasarely, they kept working together -- including taking a trip to Miami on April 15, 2013, to meet a potential client and traveling together to the Dominican Republic on May 1, 2013, to get Vasarely's visa and meet more clients. Further, in an email that Vasarely sent Rojas on May 14, 2013, she criticized him for not working, writing that "[y]esterday you did not work, today, either [sic] . . . . You were always like that and it not at your age . . . that you are going to change, [sic] you have so many distractions and constant personal errands that you simply cannot do other things." The evidence supports the district court's conclusion that, when taken in context of the parties' relationship and subsequent dealings, the April 7 email was not sufficient notice of termination.

In finding that the May 17, 2013 email constituted sufficient notice, the district court noted that on May 16, 2013, Vasarely emailed Rojas that she would "cancel all pending projects" if she did not receive her artwork before 1:00 p.m. the following

day.[9]  The next day, in her May 17, 2013 email, Vasarely referenced her cause for terminating the agreement -- Rojas's breach of contract by keeping what she claimed to be unauthorized inventory -- and was clear that, as a result, she was "going to act as I told you."  She further stated that "[w]e are not going to have any business until everything is clarified with attorneys and all my works of art are in my possession."  Given this support from the evidence in the record, the district court did not clearly err in finding that Vasarely gave sufficient notice of her intent to terminate the 2010 Artwork Agreement on May 17, 2013.

### b. Modification of the penalty

Upon official termination of the agreement, eight days after sufficient notice was given Clause 12 of the agreement provided that Inart had to return all works of art to Vasarely within forty-eight hours by depositing them in a storage facility of Vasarely's choice.  If Inart did not return the artwork within forty-eight hours of termination, Inart would be fined $1,000 per day payable to Vasarely.  As Vasarely gave sufficient notice of her intent to terminate the 2010 Artwork Agreement on May 17, 2013, the district court found that, pursuant to the agreement, the contract terminated eight days later, and then Rojas had two

---

[9]  This statement from her May 16, 2013 email further indicates that Vasarely had not ended business dealings with Rojas.

additional days after that termination date, or until May 28, 2013, before the $1,000 daily fine began to accrue. It is undisputed that Rojas returned the artwork on February 7, 2014, 255 days later, and therefore the penal clause of the Agreement called for a $255,000 fine.

As an initial matter, we address Vasarely's criticism of the district court's inclusion of an eight-day termination notice window, which she says was done "to minimize the fines for [Rojas]." We easily dispose of this charge. Clause 11 of the 2010 Artwork Agreement unmistakably states that the contract "can be terminated for reasonable cause or for breach of contract, with eight (8) days['] notice." Thus, the district court was correct in including an eight-day termination notice window before finding that Clause 12 was triggered. As Vasarely gave sufficient notice to terminate the contract on May 17, the 2010 Artwork Agreement was terminated on May 25, 2013. Pursuant to Clause 12, Rojas then had forty-eight hours from contract termination to return the artwork.

But the district court did not award Vasarely $255,000. Although the court found the penalty award appropriate in light of the estimated value of the artwork that Rojas withheld, the court reasoned that it was proper to toll the accrual of the daily penalty from the day that Rojas brought the underlying lawsuit on

October 9, 2013. The court found this tolling justified as Rojas had moved to attach the artwork in the litigation on the day that they filed suit and this attachment issue was litigated over several days of hearings and ultimately denied by the court on January 30, 2014. In denying the motion, the court gave Rojas until February 10, 2014, to return all of the artwork to Vasarely. As Rojas returned the artwork on February 7, 2014, the district court modified the penalty accordingly to reflect the 134 days that passed between May 28, 2013, and October 9, 2013.

Vasarely states that the district court erroneously "took on the role of Rojas'[s] counsel" when it sua sponte modified the penal clause, despite the fact that this equitable remedy was never raised by Rojas and was therefore waived. Noting that penal-clause modifications should only be utilized with "great caution and notorious justification," Jack's Beach Resort, Inc. v. Tourism Dev. Co., 12 P.R. Offic. Trans. 430, 438 (P.R. 1982), she says that the fact that attachment hearings were proceeding while Rojas kept her artwork is not an extraordinary circumstance for modification; rather, it was a self-created circumstance by Rojas.

The district court acted within its discretion to modify the penalty award for Rojas's delinquent return of Vasarely's artwork. See id. at 437-40; see, e.g., In re Alvarez, 473 B.R. 853, 861-63 (B.A.P. 1st Cir. 2012). Even though the court

in Jack's stated that the "equity must be prayed for," the Jack's court found the debtor's mere objection to foreclosure proceedings was sufficient to trigger the lower court's authority to then exercise its equitable powers. 112 P.R. Offic. Trans. at 439. Similarly, here, Rojas's allegation that he did not breach the 2010 Artwork Agreement and that a penal award was not justified was equally sufficient to "activate the court's equitable intervention." Id. Therefore, the district court did not abuse its discretion in sua sponte taking up the issue of penalty modification.

Here, the resulting unfairness of a penalty award accumulating while Rojas's motion for attachment was being litigated was sufficient justification for the district court to exercise its "broad but not unfettered" discretion to reduce the penal award. In re Alvarez, 473 B.R. at 863. The very issue of whether the pieces of art needed to be returned immediately to Vasarely was the subject of Rojas's motion, and therefore it was well within the discretion of the district court, in its "balanc[ing] between the punitive and remunerative functions of penal clauses," id., to toll the accrual of the daily penalty from the day the motion was initially filed, October 9, 2013. We find that the district court did not abuse its discretion in modifying the penalty for Rojas's failure to timely return Vasarely's artwork

to $134,000.

### 5. __Moral Damages__

We reach Vasarely's last claim of error -- that the district court did not adequately assess the moral and mental damages that she suffered as a result of Rojas's actions. Under Puerto Rico law, "a court may award moral damages for the mental and emotional suffering of a party which follows as a foreseeable consequence of a defendant's acts or omissions." Gonzalez-Marin v. Equitable Life Assur. Soc. of the U.S., 845 F.2d 1140, 1148 (1st Cir. 1988). A plaintiff must prove: "(1) an act or omission constituting fault or negligence; (2) injuries; and (3) a causal connection between the act or omission and the injuries." In re Caribbean Petroleum, LP, 561 F. Supp. 2d 194, 199 (D.P.R. 2008) (citing Bacó v. Almacén Ramón Rosa Delgado, Inc., 151 P.R. Dec. 711, 725 (P.R. 2000)).

After finding that Rojas acted with both fault and negligence in failing to return Vasarely's artwork and the keys to her storage units, and finding that this caused Vasarely extreme stress and anxiety that exacerbated her stress-related illness, the district court awarded Vasarely $5,000 for mental anguish. Vasarely claims that the district court abused its discretion by disregarding testimony of other damages that she suffered, including that Rojas: deprived her of her Chicago properties and

"took away her visa, her artwork, her car, her web sites, her health insurance, her reputation, her last name, the good will of her artwork, her physical integrity, and her peace of mind." She urges this Court to modify this damages award to compensate her for the full amount of the fine under Clause 12 of the 2010 Artwork Agreement, accounting for an April 7, 2013 termination date.

Vasarely bases her arguments on stipulated facts contained in the parties' Joint Pretrial Order, which include that during the ongoing litigation, Rojas filed a criminal complaint against Vasarely for illegal misappropriation of a Mercedes car that she alleged belonged to her, and that Rojas cancelled her health insurance policy and notified her a month later. While these agreed-upon facts prove that Rojas took certain actions, Vasarely provided no evidence before the district court that these actions were harmful or even wrong. The district court did not need to individually assess each conclusory allegation of wrongdoing for which Vasarely provided no support. Furthermore, Vasarely did not prove that any of Rojas's actions directly caused her any sufferings beyond the anxiety and stress that the district court already considered.

Vasarely further argues that the district court only considered damages that she suffered until October 2013, when this underlying litigation began. She posits that the district court

needlessly disregarded ongoing damages that Rojas caused her while the litigation was pending. But, as Vasarely correctly acknowledges, the district court has wide discretion in determining the appropriate award for moral damages, see Gonzalez-Marin, 845 F.2d at 1148-49, and may determine the relevant period of injury suffered from the defendant's actions that is supported by the record, see T & S Serv. Assocs., Inc. v. Crenson, 666 F.2d 722, 728 (1st Cir. 1981). We see no basis for disturbing the district court's award based on the record before us.

## III. CONCLUSION

We linger no further. The record reflects that the district court's factual findings are supported by the evidence, that it properly applied the law to the facts, and that it did not abuse its discretion where such discretion was afforded it. Accordingly, the district court's judgment is **affirmed**.