# United States Court of Appeals
## For the First Circuit

Nos. 24-1317
    24-1318
    24-1385

ASSOCIATION TO PRESERVE AND PROTECT LOCAL LIVELIHOODS; B.H.
 PIERS, L.L.C.; GOLDEN ANCHOR, L.C., d/b/a Harborside Hotel;
B.H.W.W., L.L.C.; DELRAY EXPLORER HULL 495 LLC; DELRAY EXPLORER
         HULL 493 LLC; ACADIA EXPLORER 492, LLC,

          Plaintiffs-Appellants/Cross-Appellees,

       PENOBSCOT BAY AND RIVER PILOTS ASSOCIATION,

          Plaintiff-Appellant/Cross-Appellee,

                         v.

                   CHARLES SIDMAN,

          Defendant-Appellee/Cross-Appellant,

   TOWN OF BAR HARBOR, a Municipal Corporation of the State of

                        Maine,

              Defendant Appellee.

       APPEALS FROM THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MAINE

      [Hon. Lance E. Walker, U.S. District Judge]

Before

Barron, <u>Chief Judge</u>,
Breyer,<sup>*</sup> <u>Associate Justice</u>,
and Kayatta, <u>Circuit Judge</u>.

————————————

Timothy C. Woodcock, with whom <u>P. Andrew Hamilton</u> and <u>Eaton Peabody</u> were on brief, for appellants Association to Preserve and Protect Local Livelihoods; B.H. Piers, L.L.C.; Golden Anchor, L.C., d/b/a Harborside Hotel; B.H.W.W., L.L.C.; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; Acadia Explorer 492, LLC.

C. Jonathan Benner, with whom <u>John S. Kingston</u>, <u>Kathleen E. Kraft</u>, and <u>Thompson Coburn LLP</u> were on brief, for appellant Penobscot Bay and River Pilots Association.

John C. La Liberte, <u>Pioneer Legal, LLC</u>, <u>Theodore J. Folkman</u> and <u>Rubin and Rudman, LLP</u> on brief for The Pioneer Public Interest Law Center, amicus curiae.

Derek L. Shaffer, <u>Christopher G. Michel</u> and <u>Quinn Emanuel Urquhart & Sullivan, LLP</u> on brief for Cruise Lines International Association, Inc., amicus curiae.

Robert J. Papazian, with whom <u>Gebhardt & Kiefer, P.C.</u>, <u>David P. Silk</u>, <u>Richard P. Olson</u>, Jason J. Theobald, and <u>Curtis Thaxter LLC</u> were on brief, for defendant Charles Sidman.

Jonathan P. Hunter, with whom <u>Stephen W. Wagner</u> and <u>Rudman Winchell</u> were on brief, for defendant Town of Bar Harbor.

————————————

August 11, 2025

————————————

---

<sup>*</sup> Hon. Stephen G. Breyer, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**BARRON, <u>Chief Judge</u>**.  The Town of Bar Harbor, Maine is a famously scenic coastal community of roughly 5,500 residents. It sits at the edge of Frenchman Bay and provides easy access to Acadia National Park.  A much sought-after tourist destination, the town's population has been known to swell many times over during the summer and fall.  Of late, Bar Harbor also has become a popular port of call for very large cruise ships, which may carry upwards of 5,000 passengers at a time.  The resulting influx of visitors led in 2022 to the adoption of the town measure before us here: an ordinance that caps at 1,000, in total, the number of people who may "disembark" each day from any cruise ship -- defined as any watercraft with 49 or more berths, see Bar Harbor, Me., Code § 153-22(B) (2012) -- and then come ashore at any of the piers in Bar Harbor (the "Ordinance").

After a three-day bench trial, the United States District Court for the District of Maine denied the request to enjoin the Ordinance and found in favor of the defendants on all but one of the claims.  We largely affirm that ruling in this appeal, although we vacate and remand the portion that rejects the claims alleging that the Ordinance violates the negative aspect of the U.S. Constitution's Commerce Clause, which is often referred to as the Dormant Commerce Clause.  We also dismiss as moot the appeal and the cross-appeal, insofar as each takes aim at the District Court's ruling on the one claim -- based on an allegation

of federal regulatory preemption -- for which declaratory but not injunctive relief was granted.

## I.

## A.

The plaintiffs are the Association to Preserve and Protect Local Livelihoods (APPLL); B.H. Piers, L.L.C.; Golden Anchor, L.C.; B.H.W.W., L.L.C.; Delray Explorer Hull 495 LLC; Delray Explorer Hull 493 LLC; and Acadia Explorer 492, LLC (collectively, "the plaintiffs").  APPLL "is a business league comprised of members who own or operate businesses in Bar Harbor and seek to capitalize on the economic opportunities associated with the provision of goods and services to cruise ship passengers."

Delray Explorer Hulls and the Acadia Explorer are limited liability companies that own tender vessels.  They ferry cruise passengers between cruise ships anchored in Frenchman Bay and Bar Harbor's piers.  B.H. Piers and Golden Anchor own the piers in Bar Harbor where cruise passengers come ashore.  B.H.W.W. LLC -- otherwise known as Bar Harbor Whale Watch Company -- coordinates whale watching tours to cater to cruise passengers visiting Bar Harbor.

The plaintiffs filed their complaint on December 29, 2022.  It alleges that the Ordinance violates the Supremacy Clause of the United States Constitution because it is

- 4 -

preempted by federal law. The complaint further alleges that the Ordinance violates the Commerce Clause of the United States Constitution, see U.S. Const. art. I, § 8, cl. 3 -- or, really, what is usually referred to as the Dormant Commerce Clause -- due to how the Ordinance regulates interstate commerce. Finally, the complaint alleges that the Ordinance violates the Due Process Clause of the United States Constitution by "unreasonably depriv[ing] Plaintiffs of their property interests" in "U.S. Coast Guard approvals." For relief, the plaintiffs seek a declaratory judgment that the Ordinance is unlawful as well as a preliminary and a permanent injunction to prevent the Ordinance's enforcement.

After the plaintiffs filed their complaint, the Penobscot Bay and River Pilots Association ("the Pilots") submitted a "complaint in intervention for declaratory and injunctive relief." The Pilots are a private corporation that provides pilotage services to foreign and domestic cruise vessels when they enter waters in and around Bar Harbor and that, "[i]n response to the expansion of cruise vessel traffic, . . . has invested in vessels and has expanded its employment of pilots."

The Pilots' complaint sets forth many of the same claims as the plaintiffs' complaint. It also adds two additional claims alleging that the Ordinance exceeds the Home Rule authority that municipalities in Maine enjoy under the Maine Constitution. The first such claim alleges that the Ordinance is preempted by a Maine

- 5 -

statute that regulates pilotage. The second alleges that the Ordinance is preempted insofar as it "frustrates the purposes of Maine's efforts to maintain state level coordination of economic development policies and programs," because the measure is "inconsistent with Maine's goals of tourism and tourism-based revenue growth" and "efforts to promote the cruise industry in Maine." For relief, the Pilots seek a series of declaratory judgments against Bar Harbor and a permanent injunction barring the Ordinance's enforcement.

In January 2023, Charles Sidman, a resident of Bar Harbor and a primary proponent and co-author of the local initiative measure that led to the Ordinance, moved to intervene as a defendant. The motion was granted in February 2023.

Bar Harbor filed its answers and responses to the Pilots' and the plaintiffs' complaints that same month. Sidman filed answers and responses to both complaints in April 2023.

After the District Court denied a motion to dismiss by Sidman that Bar Harbor joined, the suit proceeded on an expedited basis to a bench trial in July 2023. The trial lasted three days. All parties submitted written closing arguments as well as post-trial briefing. The District Court issued its decision in March 2024.

**B.**

In its written opinion accompanying the judgment, the District Court detailed the events that led to the Ordinance's adoption.  It explained that, because of Bar Harbor's proximity to Acadia National Park, "the cruise ship industry regards Bar Harbor as a marquee destination, the kind which appeals to customers and around which an appealing cruise itinerary can be built."  To capitalize on this reputation, Bar Harbor began courting increased cruise tourism beginning in the mid-2000s.

In 2008, however, Bar Harbor adopted a policy of capping the total number of cruise passengers who could disembark and come ashore at one of the town's piers on any given day.  The policy limited such disembarkations to 3,500 passengers per day during July and August, when tourism peaks, and 5,500 passengers per day in the "shoulder-season" months of May, June, September, October, and November.

These caps were predicated on voluntary participation by the cruise industry, and so they were not accompanied by any enforcement mechanism.  To manage the caps, Bar Harbor instituted a reservation system overseen by the town's harbormaster.  The system managed the schedules of cruise ship lines that wished to include Bar Harbor on their itineraries.

Cruise ships continued to call on Bar Harbor in ever larger numbers.  In turn, local businesses grew to meet the

increased demand for services. "[M]ore and larger cruise ships anchored in Frenchman Bay [off of Bar Harbor] and cruise ship passenger visitation levels started to approach or meet the established daily caps on an ever-increasing and consistent basis."

Cruise passengers account for a "limited portion" of Bar Harbor's annual visitors, but, as cruise visitation to Bar Harbor grew, town residents increasingly voiced their displeasure to town leaders. Acknowledging this discontent, the Cruise Lines International Association proposed lowered passenger caps as part of a negotiation with Bar Harbor in July 2021.

In the fall of 2022, Bar Harbor entered into Memoranda of Agreement (the "MOAs") with more than ten major cruise lines that called at the town's port. Through the MOAs, these cruise lines voluntarily accepted lowered disembarkation caps of 3,800 passengers per day in May, June, September, and October; monthly caps of 65,000 passenger disembarkations for those months; and the withdrawal of the months of April and November from Bar Harbor's reservation system.

Some residents still were not satisfied with Bar Harbor's attempts to manage cruise ship passenger visitation. They proposed an initiative measure (the "Initiative"). It provided for mandatory caps, enforced via penalty.

The Initiative's statement of purpose asserted:

> Underlying this proposed amendment is the fact that, in recent years, the Town has been a popular port of call for cruise ships of varying sizes, from which passengers disembark via tender boats that offload passengers directly into the downtown area. The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions, all of which result in a diminished quality of life for Town residents.

The statement of purpose also highlighted concerns about public safety:

> The unchecked and continued influx of disembarking cruise ship passengers in the downtown area jeopardizes the Town's ability to deliver municipal services to Town residents and visitors (for example, cruise ship passengers), including the provision of public safety services (police and fire), emergency medical services (EMS), in-patient and out-patient services at local hospitals, pandemic control measures, and public sanitation services, and also impacts the ability of local shops, restaurants, and other businesses to attract and serve customers.

Bar Harbor voters approved the Initiative in November 2022. The vote was 1,780 to 1,273. The town then adopted the Ordinance, see Bar Harbor, Me. Code, § 125-77(H) (2022). It provides that "no more than 1,000 persons, in the aggregate, may disembark on a single calendar day from any cruise ship(s) and come to shore on, over, or across any property located within the

- 9 -

Town of Bar Harbor." Id. It also establishes a fine to be imposed on the owner of any property in the town that permits a passenger to come ashore on their property after 1,000 persons from cruise ships already have come ashore onto property in the town on that same day. The fine ranges from one hundred to five thousand dollars per passenger disembarked in excess of the 1,000-person cap. Id. § 125-77(H)(4); see Me. Rev. Stat. Ann. tit. 30-A, § 4452(3)(B) (2025).[1]

## C.

The District Court's written opinion also set forth factual findings about the impact of cruise ship visitation on Bar Harbor, as well as the Ordinance's impact on that visitation. The District Court ultimately concluded -- based on factual findings discussed further below -- that, with respect to the Initiative's "expresse[d] concern for public safety due to congestion," there was no evidence to support it anywhere other than at Bar Harbor's waterfront. The District Court further found that "the press of cruise ship passengers is sufficient to raise safety concerns" at the waterfront, though it noted that "to date there does not appear

---

[1] Apart from the Ordinance, Bar Harbor also imposes a per-passenger use fee on cruise ships that anchor in town, which generates roughly $1,000,000 in revenue for the town each year. No party contends that this use fee is relevant to the disposition of this appeal.

to be an incident illustrating any past failure in the delivery of public services occasioned by passenger congestion" in that area.

The Initiative's "stated purposes have greater significance," the District Court found, "in regard to congestion and all that congestion entails, such as overtaxed public facilities, long lines, crowded sidewalks and businesses, slowed traffic, and the like." It found that "[cruise] passengers' impact on the relatively confined waterfront area is marked, though their spillover impact on the Town more widely is best described as cumulative. But even further up Main Street and in public areas the impact is real and tangible to locals who visit the downtown." (Footnote omitted).

As to the Ordinance's impact on cruise ship visitation to Bar Harbor, the District Court found that cruise ships would be unlikely to visit Bar Harbor at all if they were unable to disembark their entire complement of passengers and have them come ashore in the town. As a result, it found, "[c]ruise lines with large ships w[ould], necessarily, adjust their itineraries and reroute high-berth ships to other ports." For this reason, it found that the Ordinance would "reduce passenger visitation volume by a significant percentage, likely north of 80 and possibly as high as 90 percent (in the short term) compared with" the 2022 and 2023 seasons. Beyond the short term, the District Court concluded that "[e]ven if visitation is eventually maximized under the

- 11 -

Ordinance, the overall number of cruise ship passenger visits would be significantly less than the level of visitation experienced in 2022 and 2023 and less than a third of the level authorized under the recent MOAs."

**D.**

The District Court ultimately entered judgment against all the plaintiffs' and the Pilots' claims but one. As to that claim, the District Court concluded that, to the extent the Ordinance prevented cruise ships' crew members from coming ashore, it was preempted by federal maritime security regulations that require the owners or operators of maritime facilities to ensure shore access for seafarers at no cost to them. See 33 C.F.R. §§ 105.200, 105.237. Even still, the District Court declined to enjoin the Ordinance based on the assurance that Bar Harbor would address this potential conflict in subsequent rulemaking to avoid any improper application of the Ordinance.

**E.**

The plaintiffs and the Pilots each timely appealed the District Court's decision. Sidman, for his part, filed a timely cross-appeal, in which he challenges the District Court's holding that the Ordinance is preempted insofar as it prevents seafarers from gaining access to shore.

## II.

"Following a bench trial, this Court reviews the district court's findings of fact with deference, overturning them only when clearly erroneous, but reviews 'its legal conclusions de novo.'" Rojas-Buscaglia v. Taburno-Vasarhelyi, 897 F.3d 15, 23-24 (1st Cir. 2018) (quoting Portland Pilots, Inc. v. NOVA STAR M/V, 875 F.3d 38, 43 (1st Cir. 2017)). "This Court will overturn a finding of fact 'only if it hits us as more than probably wrong -- it must prompt a strong, unyielding belief, based on the whole of the record, that the judge made a mistake.'" Id. at 24 (citation modified) (quoting Sánchez-Londoño v. González, 752 F.3d 533, 539 (1st Cir. 2014)).

## III.

We start with the Pilots' challenge to the District Court's ruling rejecting their claim of preemption under Maine law based on the Maine State Pilotage Act. The Pilots premise this challenge on their contention that the Pilotage Act "establishes a comprehensive and compulsory pilotage system in aid of commerce and navigation" that cannot be reconciled with the Ordinance. Reviewing de novo, see Rojas-Buscaglia, 897 F.3d at 23-24, we affirm.

We agree with the District Court that none of the Pilotage Act's "statutory provisions prohibits a municipality from enacting an ordinance that restricts local passage from private

- 13 -

piers onto municipal property," because "[n]othing in the pilotage statute can reasonably be construed as [indicating] a legislative intention, express or implied, to divest municipalities of home rule authority over local, land-based, police power concerns whenever the exercise of that authority could foreseeably impact the volume of business available to pilots."  We also agree with the District Court that "[p]ilots remain free" under the Ordinance "to conduct their profession and to pilot vessels within the region, including by piloting them to Frenchman Bay anchorages." Thus, we see no basis for concluding that the Pilotage Act preempts the Ordinance under Maine law, whether the claim alleges conflict or field preemption.  See Smith v. Town of Pittston, 820 A.2d 1200, 1206 (Me. 2003) (expressing the standard for implied preemption under Maine law); Ullis v. Inhabitants of Town of Boothbay Harbor, 459 A.2d 153, 160 (Me. 1983) (assessing a claim of field preemption under Maine law); see also Me. Rev. Stat. Ann. tit 30-A, § 3001 (2025) (establishing that a local ordinance will not be preempted unless the authority for its passage is "denied either expressly or by clear implication" by the Legislature); id. § 3001(2) (establishing "a rebuttable presumption that any ordinance enacted under this section is a valid exercise of a municipality's home rule authority").

**IV.**

The plaintiffs and the Pilots raise distinct challenges to the District Court's dismissal of their various claims of federal preemption. Here, too, our review is de novo, see In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 173 (1st Cir. 2009), and here, too, we are not persuaded.

**A.**

The Supremacy Clause of the U.S. Constitution "makes federal law 'the supreme Law of the Land,' which overwhelms 'any Thing in the Constitution or Laws of any State to the Contrary.'" Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022) (quoting U.S. Const. art VI, cl. 2.). "Congress thus 'has the power to pre-empt state law.'" Id. (quoting Arizona v. United States, 567 U.S. 387, 399 (2012)). As a result, state and local measures "are preempted when they conflict with federal law." Arizona, 567 U.S. at 399. "This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Id. (first quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963); and then quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)). States and localities also "are precluded from regulating conduct in a field that Congress, acting within its proper

authority, has determined must be regulated by its exclusive governance."  Id.

**B.**

There is no merit to the plaintiffs' and the Pilots' challenge to the District Court's rejection of their claims that the Ordinance is preempted because it imposes an additional condition on "entry" into the United States.[2]  In concluding that "[t]he Ordinance does not prohibit or otherwise prevent entry to the United States," the District Court explained that, under the Ordinance, "[a]nyone admitted to the United States by [federal immigration authorities] through a process that transpires aboard ship in Frenchman Bay may enter the United States, including in Bar Harbor."  It thus determined that the Ordinance "imposes only a limitation on local disembarkations and a fine for excessive disembarkations," which is not itself an "additional condition for admission" and does not "otherwise purport to supply a basis for exclusion from the United States."

There is no basis for this preemption claim.  Because Frenchman Bay is within the territorial waters of the United

---

[2] Amicus Cruise Lines International separately contends that any condition delaying the entry of foreign nationals into the United States violates federal treaty obligations, but because no party raises this argument, we do not address it.  See Ryan v. U.S. Immigr. & Customs Enf't, 974 F.3d 9, 33 n.10 (1st Cir. 2020) ("The customary praxis in this circuit is to eschew arguments raised only by amici and not by the parties.").

States, an individual on board a cruise ship anchored there has "entered" the United States once federal immigration officials deem that individual lawfully admitted to the United States. The Pilots acknowledge that U.S. Custom and Border Protection (CBP) does its inspections, and deems passengers aboard cruise ships lawfully admitted, while those ships are anchored in Frenchman Bay as "a matter of mutual convenience for federal personnel and for the vessel owners and passengers." The Ordinance therefore does not impede any passenger from entering the United States.[3]

The Pilots' reliance on Cormier, 51 F.4th 1, is misplaced. There, after analyzing a federal statutory scheme and its legislative history, we held that Congress had made manifest its "considered judgment that agricultural employers who cannot find qualified U.S. workers should be able to hire foreign laborers when specified criteria are satisfied." Id. at 9. We therefore held that a "state law purport[ing] to forbid the employment of some of the very same laborers whom federal law authorizes to work" was preempted because it "would nullify the implicit federal right of the employer to hire foreign laborers on a temporary basis when -- through a process established by federal law -- federal

_____

[3] To be sure, if CBP were to elect in the future to conduct its inspections on land, then a conflict between these federal regulations and the Ordinance perhaps could arise. But, as no party contends to us that this conflict has existed or that it will, we have no reason to address that possibility in this appeal.

officials have specifically determined that U.S. workers are unavailable for the job and unaffected by the competition."  Id. at 10.

The federal regulations relevant in the present case, however, do not purport to address what an individual who has been granted entry into this country may do thereafter.  They therefore do not reveal a federal legislative purpose implicit in their authorizing statute to which the Ordinance stands as an obstacle.  See Murphy v. Nat'l Collegiate Athletic Ass'n, 584 U.S. 453, 477 (2018) (explaining that preemption is found when "Congress enacts a law that imposes restrictions or confers rights on private actors [and] a state law confers rights or imposes restrictions that conflict with the federal law"); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle [to warrant preemption] is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.").

## c.

There is similarly no merit to the Pilots' challenge to the District Court's rejection of their claim that the Ordinance is preempted because "federal interests in safety, commerce, foreign affairs, health, immigration, environmental protection, and port security define a field of federal primacy that limits additions of local conditions on vessel operations."  The Supreme

- 18 -

Court made clear in Virginia Uranium, Inc. v. Warren, 587 U.S. 761 (2019), that "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." Id. at 767. Thus, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." Id. (quoting P.R. Dep't of Consumer Affs. v. ISLA Petroleum Corp., 485 U.S. 495, 503 (1988)); see also Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 629 (1st Cir. 1994) ("State regulation of primary conduct in the maritime realm . . . presents the most direct risk of conflict between federal and state commands, or of inconsistency between various state regimes to which the same vessel may be subject," but such regulation "is not automatically forbidden.").

The only specific provisions of federal law that the Pilots invoke in support of this claim of preemption are federal regulations that concern certificates of inspection that vessels must secure to "operate" in waters subject to the jurisdiction of the United States. See 46 C.F.R. § 71.01-2; 46 U.S.C. § 3303. Those regulations provide that the certificates must "describe the vessel, the route the vessel may travel, the minimum manning requirements, the safety equipment and appliances required to be on board, the total number of persons that may be carried, and the

names of the owners and operators." 46 C.F.R. § 2.01-5; see also id. § 2.01-6.

The regulations "have preemptive effect over State or local regulations in the same field," id. §§ 70.01-1, 71.01-1, but the burden is on the Pilots to establish that such a field encompasses the Ordinance. Yet they do not explain why we must understand a vessel's permission to "operate," as the regulations use that term, to encompass permission to offload passengers or cargo at any port of the vessel's choosing. Absent this explanation, we see no reason to adopt that understanding of the federal regulation at issue. See Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 447 (1960) ("The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power . . . . Thus, a federally licensed vessel is not, as such, exempt from . . . the local regulation of wharves and docks.").

**D.**

The Pilots also contend that the District Court erred in rejecting their claim of preemption because "[c]ruise operations" must "comply with all federal environmental, health, financial responsibility, and navigational constraints as a condition of their presence in U.S. waters" and because cruise vessels are "subject to rigorous periodic federal inspections throughout [their] operational li[ves]." They explain that "[e]ven when

federal licensing and supervision were rudimentary and vastly less comprehensive, the courts recognized the federal nature of maritime commerce and activity." They cite as support an 1859 case that they argue establishes that a federal vessel license precludes a state from imposing certain reporting requirements related to vessel ownership. See Sinnot v. Davenport, 63 U.S. 227, 241-42 (1859).

As further support, the Pilots cite to cases that they contend establish the preemptive effect of federal law on "vessel standards, certain liability and judicial procedures, in rem proceedings, port fees, equipment, manning, training, operations, safety, and environmental protection matters," and that "[f]ederal permission to 'navigate United States waters prevails' over 'contrary state judgment.'" (Citation modified) (quoting Ray v. Atl. Richfield Co., 435 U.S. 151, 165 (1978)). They then argue that resolution of preemption concerns in the maritime context "has always considered health of the nation's commerce and the need for a clear overarching federal maritime authority."

Put otherwise, the Pilots contend that the "federal maritime regulatory scheme and its related international conventions address all levels of a passenger vessel's operations from blueprints to scrapping." They therefore contend that because "the Ordinance's restrictions directly impact [a] vessel's main function and operation" "of embarking, transporting, and

- 21 -

disembarking passengers," those restrictions "implicate federal interests" in a context "where risk of incompatibility with federal interests is greatest."

The only specific provisions of federal law to which the Pilots cite with respect to this claim of field preemption, however, are the federal regulations that concern the certificates to operate discussed above. See Va. Uranium, 587 U.S. at 767. Those regulations, for reasons we have explained, do not have the claimed preemptive effect.

The Pilots invoke United States v. Locke, 529 U.S. 89 (2000), for the proposition that "[s]tate or local laws that require a vessel 'to modify its primary conduct outside the specific body of water purported to justify the local rule' or that impose 'a substantial burden on the vessel's operation within the local jurisdiction itself' must give way to federal maritime interests," (quoting Locke, 529 U.S. at 112). But Locke did not give force to the preemptive effect of a generalized federal maritime interest. See Locke, 529 U.S. at 112. It concerned the preemptive effect of a particular statute -- the Ports and Waterways Safety Act, 86 Stat. 424 (1972) (codified as amended at 46 U.S.C. §§ 70000-70054). The Pilots do not rely on that statute, and Locke's reasoning does not suggest that the federal statutes on which the Pilots do rely preempt the Ordinance.

- 22 -

The other maritime preemption cases on which the Pilots rely offer no more help to them. Each similarly concerned a claim of preemption based on specific provisions of federal law on which the Pilots do not rely, not a general interest in uniformity in the maritime realm.[4]

**E.**

The Pilots also challenge the District Court's rejection of their claim that the Ordinance directly conflicts with the U.S. Coast Guard's designation of two locations in Frenchman Bay as "federal anchorages." They point out that the Coast Guard is authorized, as delegee of the U.S. Secretary of Homeland Security, to "establish anchorage grounds for vessels in . . . bays . . . of

---

[4] These cases include Sinnot, 63 U.S. at 239-43 (finding preemption based on federal statute, passed in 1793, "providing for the enrol[l]ment and license of vessels engaged in the coasting trade"); Great Lakes Ins. SE v. Raiders Retreat Realty Co., 601 U.S. 65, 73-74 (2024) (federal maritime law); Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 27-28 (2004) (same); Ray, 435 U.S. at 174 (Ports and Waterways Safety Act); see also Ballard, 32 F.3d at 626-31 (federal maritime law); Huron Portland Cement, 362 U.S. at 444-46 (federal ship inspection and licensing statutes); Askew v. Am. Waterways Operators, Inc., 411 U.S. 325, 330, 341 (1973) (Water Quality Improvement Act and Admiralty Extension Act); Am. Dredging Co. v. Miller, 510 U.S. 443, 447 (1994) (federal forum non conveniens doctrine). We note for clarity that many of the cases on which the Pilots rely concern the preemptive effect of federal maritime law, which refers to a body of federal common law that has been developed in the admiralty context pursuant to the Judiciary's jurisdiction under the Constitution's Admiralty Clause. See Ballard, 32 F.3d at 625; U.S. Const. art. III, § 2. The Pilots do not suggest, in referring to general federal maritime interests, that they mean to invoke the preemptive reach of this body of law.

the United States whenever it is manifest . . . that the maritime or commercial interests of the United States require such anchorage grounds for safe navigation." 46 U.S.C. § 70006. They note, too, that the Coast Guard has designated two such anchorage grounds in Frenchman Bay, reserving one "primarily for passenger vessels 200 feet and greater." 33 C.F.R. § 110.130(b). They further note that the Coast Guard has issued regulations for the use of that anchorage, see id. § 110.130.

In addition, the Pilots highlight the fact that the Federal Register establishing the two Frenchman Bay anchorages provides that "'no fees, permits, or specialized requirements' are required 'for the maritime industry to utilize [this] anchorage area[].'" (Quoting 67 Fed. Reg. 68517). The Pilots then contend that the Ordinance impermissibly "imposes a specialized requirement" that forces ships to "disembark fewer than 1,000 persons," which "renders it operationally impracticable for vessels in excess of 1,000 lower berth capacity to use these anchorages for the purposes that the Coast Guard intended."

The District Court correctly observed, however, that "the Ordinance imposes no restriction whatsoever on Frenchman Bay anchorage access." (Emphasis added). The Pilots also do not point to anything in the record that would indicate the Ordinance interferes with any cruise ship's ability to anchor. And they do not explain in their opening brief what purpose the Coast Guard

- 24 -

sought to advance -- beyond the ability to safely moor -- in establishing these anchorages. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The Pilots do suggest in their reply brief that the Ordinance stands as an obstacle to the federal anchorage regulations because those regulations seek to "facilitate maritime commerce in Bar Harbor." But that suggestion comes to us too late for us to consider it. See Sparkle Hill v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief."). Thus, the Pilots have not shown how the District Court erred in rejecting this claim of federal preemption.

**F.**

The plaintiffs' final challenge concerning a claim of federal preemption pertains to their claim that the Ordinance is preempted, in part, by federal regulations addressing the rights of vessel crew members -- so called "seafarers" -- to have access to shore, see 33 C.F.R. §§ 105.200, 105.237. The District Court agreed that the Ordinance conflicts with these regulations, but it declined to enjoin the Ordinance in its entirety on this basis. The plaintiffs contend that it was error for the District Court

- 25 -

not to do so, while Sidman cross-appeals on the ground that the District Court was wrong to find preemption based on the relevant regulations in the first place.

As Bar Harbor points out, the town enacted a local measure ("Chapter 52") to implement the Ordinance's terms a few months after the District Court's decision. Chapter 52 makes clear that the Ordinance's daily disembarkation limit does not apply to so-called seafarers. See Bar Harbor, Me. Code § 52-6(C)(4) (2024) (applying the disembarkation limit to "Persons"); id. § 52-5 (2024) (defining "Persons" to include "passengers of cruise ships [but] not those persons covered by 33 C.F.R. § 105.200 and 33 C.F.R. § 105.237").

Chapter 52 must be understood to have impliedly repealed the Ordinance insofar as that measure initially did apply to those individuals. See Diaz-Ramos v. Hyundai Motor Co., 501 F.3d 12, 17 (1st Cir. 2007) ("An implied repeal will . . . be found . . . where the latter act covers the whole subject of the earlier one and is clearly intended as a substitute." (quoting Branch v. Smith, 538 U.S. 254, 273 (2003) (plurality opinion))). There is thus no longer a live controversy over whether the Ordinance is preempted by seafarer access regulations. See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 621 (1st Cir. 1995) ("[A]n appeal, although live when taken, may be rendered moot by subsequent developments."). And the mere fact

- 26 -

that Chapter 52 is subject to a pending challenge does not indicate otherwise. See Harris v. Univ. of Mass. Lowell, 43 F.4th 187, 195 (1st Cir. 2022) ("[A]voiding mootness cannot rest on 'speculation' about some future potential event." (quoting Pietrangelo v. Sununu, 15 F.4th 103, 106 (1st Cir. 2021)). We thus dismiss this portion of the appeal, as well as the cross-appeal, as moot.[5] See Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001).

## V.

We move on to the challenge by the plaintiffs -- though not the Pilots -- to the District Court's ruling rejecting the claim that the Ordinance violates their rights under the Due Process Clause.[6] The plaintiffs acknowledge in pressing this challenge that the Ordinance is subject only to rational basis review. But they contend that the Ordinance cannot survive even this most forgiving form of scrutiny because the "terms of the Ordinance lack 'a reasonable relation to a proper legislative

---

[5] Because we conclude the cross-appeal is moot, we need not address whether Sidman has standing under Article III of the U.S. Constitution to challenge the ruling below. See Arizonans for Off. English v. Arizona, 520 U.S. 43, 65 (1997) ("[The Supreme Court] has [never] identified initiative proponents as Article-III qualified defenders of the measures they advocated.").

[6] The plaintiffs separately contend that the District Court erred because it suggested, wrongly, as to seemingly all the claims, that the plaintiffs and the Pilots sought "a sweeping ruling that the Town could never limit cruise ship visitation in any way or under any circumstances." We do not see how the District Court's decision may be so read.

- 27 -

purpose.'" (Citation modified) (quoting Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 483 (1st Cir. 2009)). The plaintiffs premise the Due Process claim on the fact that, as they put it, (1) "the Ordinance singled out persons arriving by cruise ship and excluded persons arriving by any other means of transportation," (2) it "did so, even though the volume of overall tourist visitation, including cruise ship visitation, was governed by seasonal factors," and (3) the Ordinance "imposed a single, unyielding ceiling applicable every day of the year, even days on which no cruise ship has ever called at Bar Harbor." Reviewing de novo, see Rojas-Buscaglia, 897 F.3d at 23-24, we see no merit to the claim.

Although the plaintiffs assert that the Ordinance's terms "lacked a rational relationship to its purported goal of effectively lessening sidewalk congestion," they must show that there is no "reasonably conceivable state of facts that could provide a rational basis" for the measure.[7] Mulero-Carrillo v. Roman-Hernandez, 790 F.3d 99, 107 (1st Cir. 2015) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)). And it is not irrational to conclude that a measure to reduce the number of

_____

[7] Because the analysis of whether a law passes rational basis review is the same under the Equal Protection Clause and the Due Process Clause, we draw our understanding of the rational-basis standard from cases examining challenges brought under both provisions. See Mulero-Carrillo v. Roman-Hernandez, 790 F.3d 99, 107 (1st Cir. 2015).

people coming into town via cruise ships would ameliorate congestion in town to at least some extent. See Beach Commc'ns, Inc., 508 U.S. at 315 ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."); Bankers Life & Cas. Co. v. Crenshaw, 486 U.S. 71, 85 (1988) ("It of course is possible that [the State] might have enacted a statute that more precisely serves these goals and these goals only; as we frequently have explained, however, a state statute need not be so perfectly calibrated in order to pass muster under the rational-basis test.").

Even if the plaintiffs could show that the Ordinance was in fact passed with the aim of "keep[ing] the biggies out" -- a reference to Defendant Sidman's previous statement that the Ordinance should be passed due to his distaste for the passengers on larger cruise ships, as compared to passengers who select smaller ships, whom he perceived as "more well-to-do" -- the plaintiffs do not explain why that would make a difference. They do not contend, for example, that the Ordinance was passed due to impermissible animus against cruise passengers. See U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973) (noting that "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest"). We thus decline to upset the District Court's ruling on this basis.

**VI.**

At last, we arrive at the centerpiece of the appeals: the plaintiffs' and the Pilots' challenge to the District Court's rejection of their Dormant Commerce Clause claims. We largely affirm the District Court's ruling in favor of the defendants as to these claims, but we do vacate and remand a portion of it.

**A.**

The Commerce Clause provides that "Congress shall have [p]ower [t]o . . . regulate [c]ommerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "'Although the Clause is framed as a positive grant of power to Congress,' [the Supreme Court] ha[s] long held that this Clause also prohibits state laws that unduly restrict interstate commerce." Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 514 (2019) (citation omitted) (quoting Comptroller of Treasury of Md. v. Wynne, 575 U.S. 542, 548 (2015)).

This prohibitory (or negative) face of the Commerce Clause is commonly referred to as the Dormant Commerce Clause. Id. Its constraints apply both to state measures and to local ones, like the Ordinance here. See, e.g., Dean Milk Co. v. City of Madison, 340 U.S. 349, 353 (1951).

Under "[m]odern [Dormant Commerce Clause] precedents," South Dakota v. Wayfair, 585 U.S. 162, 173 (2018), one of the key constraints is that a local measure "may not discriminate against

- 30 -

interstate commerce[.]" Id. Another is that a local measure "may not impose undue burdens on interstate commerce." Id.

The plaintiffs and the Pilots challenge the District Court's rejection of their claims implicating each of these constraints.[8] We first address the plaintiffs' and the Pilots' contentions, which we conclude are meritless, that pertain to claims alleging that the defendants bear the burden to justify the Ordinance under some form of especially demanding scrutiny, either because of how substantially the measure burdens cruise ship traffic or because of how it disadvantages cruise lines relative

---

[8] The plaintiffs separately contend that the District Court erred in declining to address their claim that the Ordinance impermissibly burdens the right to travel under the Commerce Clause, see, e.g., Att'y Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 902 (1986) (acknowledging that "the constitutional right to travel" has sometimes been identified as a right protected by the Commerce Clause), on the ground that the plaintiffs failed to assert this claim in their complaint and only raised it "for the first time in their [post-trial] brief in a perfunctory fashion." But we cannot see how the complaint provided "sufficient detail," Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 46 (1st Cir. 2011) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 8 (1st Cir.2011)), to give the defendants notice that the plaintiffs intended to press a right-to-travel claim when the complaint nowhere made that claim explicit or cited to any case specifically addressing the right to travel. Indeed, the first time the plaintiffs ever explicitly mentioned the right to travel or any case addressing it was in their motion for a preliminary injunction, at which point they affirmatively disclaimed any reliance on that doctrine. We thus affirm the District Court's rejection of the plaintiffs' belated attempt to read a right-to-travel argument back into their complaint. Cf. D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc., 111 F.4th 125, 133 (1st Cir. 2024) ("An appellant will not ordinarily be permitted to complain of an error which he himself invited." (quoting Orenstein v. United States, 191 F.2d 184, 193 (1st Cir. 1951))).

- 31 -

to local hotels and inns.  We then address their claims in which they allege that the defendants bear no such burden but that the Ordinance nonetheless runs afoul of the Dormant Commerce Clause because of the clearly excessive burdens on interstate commerce that they can show that the Ordinance imposes.  Here, we conclude that the challenges do have merit and that, as a result, the judgment dismissing these claims must be vacated.

**B.**

In their challenges to the District Court's ruling rejecting one set of their claims alleging that the defendants have failed to meet the burden that they bear to satisfy an especially heightened form of scrutiny, the plaintiffs and the Pilots argue as follows.  They first direct our attention to a specific line of cases that concerns the limits on the kind of burdens that a local measure may place on interstate commerce. They contend that this line of authority bars even nondiscriminatory "local impositions on instrumentalities of interstate transportation" when they "significantly impede continuous interstate or foreign commerce," (emphasis added), unless the defendant can show that the Ordinance is of "vital necessity," (quoting Hannibal & St. J.R. Co. v. Husen, 95 U.S. 465, 473 (1877)).  They wind up this argument by contending both that the Ordinance effects such a "local imposition[]" and that, because the defendants have failed to make the "vital necessity"

showing, the District Court's ruling rejecting these claims must be reversed.

The defendants respond in part that, "[t]o the extent there was daylight between the Court's developmental 'free flow' cases and its modern approach" to the Dormant Commerce Clause, "any such distinction has collapsed." But, even if the defendants are wrong on that score, the plaintiffs and the Pilots still must show that the assertedly applicable line of authority applies to the Ordinance. And we conclude, like the District Court, that it does not.

**1.**

The plaintiffs and the Pilots trace the asserted line of authority to a brief passage (and accompanying footnote) in National Pork Producers Council v. Ross, 598 U.S. 356 (2023). They argue that, in that passage, the Court "confirmed" its prior "recogni[tion]" of "this distinct line of [D]ormant Commerce Clause cases protecting the continuous transport or 'flow' of goods and persons [in] interstate and foreign commerce."

In the relevant passage, National Pork noted that "a small number of [the Court's] cases have invalidated state laws . . . that appear to have been genuinely nondiscriminatory." Id. at 379 & n.2 (second alteration in original) (quoting Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298 n.12 (1997)). The footnote then referenced three cases in this "line" -- Bibb v.

- 33 -

Navajo Freight Lines, Inc., 359 U.S. 520 (1959), Southern Pacific Co. v. Arizona ex rel. Sullivan, 325 U.S. 761 (1945), and Raymond Motor Transportation, Inc. v. Rice, 434 U.S. 429 (1978).

**2.**

In each of those three cases, the challenged regulation required an instrumentality of interstate commerce -- whether a train in Bibb and Southern Pacific, or a truck in Raymond -- to either comply with that regulation or not pass through the regulating jurisdiction at all. See Bibb, 359 U.S. at 527-28; S. Pac. Co., 325 U.S. at 781-82; Raymond Motor Transp., Inc., 434 U.S. at 445. Each regulation thus prevented the continuous flow of interstate commerce through the regulating jurisdiction and not merely to it.

By contrast, as the defendants point out, the Ordinance only regulates what a cruise ship may do if it chooses to stop in Bar Harbor and then disembark its passengers at that port of call. Thus, because any cruise ship may pass through the waters of Bar Harbor as it makes its way to other jurisdictions without complying with the Ordinance, the Ordinance simply does not "impede the flow of interstate goods," see Nat'l Pork, 598 U.S. at 379 n.2 (emphasis omitted) (quoting Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 128 (1978)), in the same way that the regulations at issue in Southern Pacific, Bibb, and Raymond did.

The plaintiffs and the Pilots do identify other "continuous flow of commerce" cases. Some of them, however, rest on the same concern with the ability of instrumentalities of interstate commerce to continuously use an artery of interstate commerce to move through the regulating jurisdiction that drove the Court's decisions in Bibb, Southern Pacific, and Raymond. See, e.g., Wabash, St. L. & P. Ry. Co. v. Illinois, 118 U.S. 557, 572-73 (1886); Kan. City S. Ry. Co. v. Kaw Valley Drainage Dist. of Wyandotte Cnty., 233 U.S. 75, 78-79 (1914); S. Covington & C. St. R. Co. v. City of Covington, 235 U.S. 537, 547-48 (1915); W. Union Tel. Co. v. Foster, 247 U.S. 105, 114 (1918); Mo. ex rel. Barrett v. Kan. Nat. Gas Co., 265 U.S. 298, 309-10 (1926); Morgan v. Virginia, 328 U.S. 373, 386 (1946); Kassel v. Consol. Freightways Corp. of Del., 450 U.S. 662, 674 (1981). Others are also of no help to the plaintiffs and Pilots because they involved state or local regulatory measures that discriminated on their face against interstate commerce, see, e.g., Henderson v. Mayor of New York, 92 U.S. 259, 259-60 (1875); Husen, 95 U.S. at 468; Leisy v. Hardin, 135 U.S. 100, 124-25 (1890); Edwards v. California, 314 U.S. 160, 173 (1941), even though the "line" recognized in National Pork, 598 U.S. at 379 n.2, included only those cases that "invalidated state laws . . . that appear to have been genuinely nondiscriminatory," id. at 379.

The two other older cases -- <u>Gloucester Ferry Co.</u> v. <u>Pennsylvania</u>, 114 U.S. 196 (1885), and <u>Cincinnati, P., B.S. & P. Packet Co.</u> v. <u>Catlettsburg</u>, 105 U.S. 559 (1881) -- that the plaintiffs and the Pilots invoke in aid of their "flow" argument similarly fail to provide the claimed support. Neither case speaks to the situation at hand, because neither one purports to address how the Commerce Clause's negative aspect would apply to a measure that allows vessels to patronize a town and unload <u>some</u> cargo or passengers but regulates the total amount of passengers or cargo from a specific type of vessel that may be brought ashore in the town a single day.

Finally, we are not persuaded by the plaintiffs' and the Pilots' invocation of the Court's observation in the footnote in <u>National Pork</u> that it "has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods." 598 U.S. at 379 n.2 (emphasis omitted) (quoting <u>Exxon</u>, 437 U.S. at 128). Nor are we persuaded by their related reliance on <u>Cooley</u> v. <u>Board of Wardens</u>, 53 U.S. 299 (1851), for the proposition that some subjects, by their nature, "imperatively demand[] a single uniform rule, operating equally on the commerce of the United States in every port," <u>id.</u> at 319, such that the subject must be exclusively regulated by Congress.

Cooley does not suggest that a measure that operates as the Ordinance does operates in a field of interstate commerce that demands uniformity. See id. at 321 (noting that the Court's decision "does not extend to the question what other subjects, under the commercial power, are within the exclusive control of Congress, or may be regulated by the states in the absence of all congressional legislation"). And the portion of Exxon, see 437 U.S. at 128, quoted in the National Pork footnote merely repeats Cooley's admonition while citing to that case and Wabash, which, for the reasons already explained, does not itself show that such uniformity is needed here.[9]

**3.**

In sum, there is no merit to the plaintiffs' and the Pilots' contentions that the District Court erred in not requiring the defendants to show that the Ordinance was a "vital necessity." Even if there is a line of authority that would require that demanding showing for a local measure that prevents "the continuous

---

[9] The Pilots assert, for the first time in their reply brief, that the Ordinance substantially burdens interstate commerce by virtue of its obstruction of interstate commerce, relying once more on the cases it identifies as "flow" cases. Notwithstanding our long-running practice of not addressing arguments raised for the first time in reply, see Sparkle Hill, 788 F.3d at 29, this contention would fail as support for the Pilots' arguments under Pike for the same reasons that the plaintiffs and the Pilots fail to establish that this case falls within what they identify as the Court's "flow" line of authority.

flow of interstate commerce," we see no basis for concluding that line applies to a measure that operates as the Ordinance does.

## C.

There is also no merit to the plaintiffs' and the Pilots' challenge to the District Court's rejection of their other claims in which they contend that the defendants bear the burden to justify the Ordinance under an especially demanding form of scrutiny. In the claims, the plaintiffs and the Pilots allege that the Ordinance infringes the Dormant Commerce Clause's constraint on local measures that discriminate against interstate commerce.

The plaintiffs and the Pilots recognize that, by its terms, the Ordinance applies to cruise ships without regard to whether they are local or out-of-state. They stress, however, that even a facially non-discriminatory local measure may have impermissibly discriminatory "practical effect[s]." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 350 (1977). They then contend that the Ordinance is such a measure because it regulates only cruise ships, which overwhelmingly are not local but compete for overnight vacationers in Bar Harbor with hotels and inns that are. Accordingly, they argue that, because the defendants have not met their burden of justifying this discriminatory treatment,

the District Court erred in holding that their discrimination-based claims are meritless.  We disagree.[10]

**1.**

National Pork reaffirmed precedents "prohibiting the enforcement of state laws driven by economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  598 U.S. at 369 (citation modified) (quoting Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 337-38 (2008)).  Under those precedents, a local measure that discriminates against interstate commerce "is 'virtually per se invalid,'" Davis, 553 U.S. at 338 (quoting Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or., 511 U.S. 93, 99, 101 (1994)), as it "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives,'" id. (quoting Or. Waste Sys., 511 U.S. at 101).

Although the burden is on the defendant to demonstrate that a discriminatory local measure survives this demanding level of scrutiny, a plaintiff must first show that the measure does discriminate.  See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979).

---

[10] Amicus Cruise Lines International Association, Inc. contends that the Ordinance discriminates against out-of-staters who seek to come to Bar Harbor relative to locals who wish to do so.  But neither the plaintiffs nor the Pilots advance any such claim of discrimination on appeal.  We thus decline to address this ground for challenging the ruling below.  See Ryan, 974 F.3d at 33 n.10.

To do so, a plaintiff must do more than show that the measure burdens out-of-state entities more than local ones. See Exxon, 437 U.S. at 125-26. A plaintiff also must show that the allegedly favored in-state entity competes with the allegedly disfavored out-of-state entity. See Am. Trucking Ass'ns v. R.I. Tpk. & Bridge Auth., 123 F.4th 27, 38-39 (1st Cir. 2024); Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 37-38 (1st Cir. 2007).

As the Supreme Court explained in Tracy, however, it may not be enough to show the existence of such competition, even when a plaintiff can show that a challenged regulation imposes greater burdens on out-of-state competitors than local ones. And that is because "any notion of discrimination assumes a comparison of substantially similar entities." Tracy, 519 U.S at 298.

Thus, when "allegedly competing entities provide different products . . . there is a threshold question whether the companies are indeed similarly situated for constitutional purposes." Id. at 299. "This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." Id. After all, in that event, "eliminating the . . . [challenged] regulatory differential would not serve the [D]ormant Commerce Clause's fundamental objective of preserving a national market for

- 40 -

competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." Id.

**2.**

The parties do not dispute that, in burdening cruise ships more than hotels and inns, the Ordinance imposes a greater burden on out-of-state entities offering lodging than it imposes on local ones. The dispute with respect to the discrimination claims therefore arises because the plaintiffs and the Pilots contend that the record compels the conclusion that, despite the different kinds of lodging these entities offer, they compete in a single market for vacationers' dollars in Bar Harbor, such that the Ordinance favors the local competitors over the out-of-state ones. The plaintiffs and the Pilots premise this record-based contention on deposition testimony, admitted at trial, from cruise line executives that cruise lines "compet[e] with . . . land-based hotels and resorts" for "guests['] discretionary spending" and that "guests may make a choice between hotels and cruise[s] when considering holidays," including customers who "put together an overall travel experience that may include land transport and stays at various places."

There is reason to question the strength of this evidence of competition. But the District Court made no express finding that the claimed competition does not exist. See Am. Trucking Ass'ns, 123 F.4th at 39 (explaining that the question of whether

- 41 -

entities compete in a single market is one of fact).  Indeed, the District Court arguably indicated that it accepted that the cruise lines and the hotels and inns are competitors, as it rejected the discrimination claim in part by rejecting the idea that "discrimination is found and heightened standards are imposed whenever one product or service is impacted by a regulation but a competing product or service is not."  (Emphasis added).

The plaintiffs and the Pilots do not appear to contest the defendants' contention, however, that cruise lines and hotels offer different products when it comes to lodging.  Thus, we do not understand them to dispute that, under Tracy, we must ask whether the cruise lines and hotels and inns are similarly situated with respect to the market at issue.

With respect to that question, we recognize that the District Court explained in rejecting the discrimination claims that the evidence of competition here was "reductionist in the extreme."  While doing so, it then stated in a footnote that "travelers staying in hotels are dispersed throughout the Town and Mount Desert Island [and thus] do not impact the waterfront the same way that cruise lines and their passengers do."  In an earlier portion of its analysis, the District Court also expressed the view the Ordinance did not reflect intentional protectionism because "Bar Harbor's voters . . . decided to regulate traffic in

- 42 -

persons based on that traffic's distinctive contribution to locally disfavored conditions."

In these portions of the analysis, the District Court could be understood to hold that the alleged competitors are not similarly situated. But the District Court at no point expressly stated that they were not. And, in explaining why the evidence of discrimination was "reductionist," it first stated that an argument could be made that "a non-Californian producer of pork products [and] a Californian producer of beef products . . . . compete for dollars directed toward meat consumption" but that this "obvious point did not inform the Supreme Court's evaluation of the merits" in National Pork. It then added in this portion of its analysis that the same could be said of "two non-Californian producers of pork products seeking to place their products in California stores, where one complies with California law and the other does not."

Those two statements could be read to indicate -- as the plaintiffs and the Pilots contend is the case -- that the District Court reasoned that the discrimination claims were meritless simply because National Pork did not address the possibility of discrimination in that case. As the plaintiffs and the Pilots point out, however, the plaintiffs in National Pork explicitly disclaimed any discrimination-based arguments in challenging the

state regulation on pork products at issue in that case.  See 598 U.S. at 370-71.

Nonetheless, we may affirm the District Court's rejection of these discrimination-based claims on any ground manifest in the record.  See Brox v. Hole, 83 F.4th 87, 98 (1st Cir. 2023).  The defendants do not themselves ask us -- at least in any clear way -- to hold that the claimed competitors are not similarly situated.  At times, they appear to ask us to conclude merely that the hotels and inns in Bar Harbor do not compete with the cruise lines at all.  However, we conclude, reviewing de novo,[11] see Rojas-Buscaglia, 897 F.3d at 23-24, that it is manifest in the record that the entities are not similarly situated even if they do compete.

**3.**

We have recently emphasized the need to be sensitive to the factual context in assessing who is similarly situated to whom. See Am. Trucking Assn's, 123 F.4th at 38 (explaining that a toll which applied only to motor vehicles but not to bicycles would not be impermissibly discriminatory, even if motor vehicles were more likely to come from out of state, because "[n]o one . . . would

_____

[11] The question whether two competitors are similarly situated appears to be a question of law.  See Tracy, 519 U.S. at 296-97 (evaluating whether entities were similarly situated without reference to lower-court findings).  No party contends otherwise or suggests that we must defer to the District Court in any respect as to this issue.

seriously argue that motorists and bicyclists are 'substantially similar entities'" (quoting Tracy, 519 U.S. at 298-300)). And while there is no case -- whether from our court or any other -- that is directly on point here, the guidance that is available as to how to conduct this inquiry leads us to conclude that the alleged competitors here are not similarly situated, even assuming they do compete to some extent in the local market for lodging.

Tracy was the first case in which the Court made explicit that "any notion of discrimination assumes a comparison of substantially similar entities." 519 U.S. at 298. The similarly situated inquiry, however, appeared to play a role -- albeit an implicit one -- in the Court's earlier Dormant Commerce Clause decision in Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 269 (1984).[12] There, the Court addressed a Hawaii tax that applied to

---

[12] Six years prior to Bacchus, the Court rejected a claim of discrimination in Exxon, 437 U.S. 117. The Ninth Circuit has read Exxon to suggest that competing entities offering the same product in an overlapping market (retail petroleum) may not be similarly situated if they have different business models (vertically integrated dealers versus independent dealers). See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown, 567 F.3d 521, 527 (9th Cir. 2009). While we recognize that the line between entities offering the same product with different business models and entities offering different products is not always clear, the plaintiffs and the Pilots do not -- as explained above -- appear to suggest that the cruise lines and hotels offer identical products and so are only distinguishable by virtue of their differing business models.

all wholesale liquors, which were primarily produced out-of-state, but exempted pineapple wine, which was produced locally.

In deeming the tax exemption impermissibly discriminatory under the Dormant Commerce Clause, see id. at 268, the Court explicitly rejected an argument that, because pineapple wine did not compete with other beverages, the tax exemption did not discriminate in favor of the in-state product. Looking to Hawaii's justification for the exemption, the Court noted that "the legislature originally exempted the locally produced beverages in order to foster the local industries by encouraging increased consumption of their product." Id. at 269. It then reasoned that "one way that the tax exemption might produce that result is that drinkers of other alcoholic beverages might give up or consume less of their customary drinks in favor of the exempted products because of the price differential that the exemption will permit . . . . [and] nondrinkers, such as the maturing young, might be attracted by the low prices of . . . pineapple wine." Id.

Based on those features of the record, the Court was "unwilling to conclude that no competition exist[ed] between the exempted and the nonexempted liquors." Id. It therefore held that, because "the effect of the exemption is clearly discriminatory, in that it applies only to locally produced beverages, even though it does not apply to all such

products . . . . as long as there is some competition between the locally produced exempt products and non-exempt products from outside the State, there is a discriminatory effect." Id. at 271. And so, it appears, the Court impliedly determined that the purveyors of in-state pineapple wine were similarly situated to the out-of-state purveyors of different beverages in the broader beverage market, notwithstanding the seemingly differing products each offered.

The Court then decided Tracy thirteen years later. There, for the first time, the Court explicitly addressed whether two entities providing different products were similarly situated for Dormant Commerce Clause purposes, although it did not mention Bacchus in this portion of its analysis.

In that case, Ohio was alleged to have discriminated against interstate commerce by exempting one set of natural gas retailers, which consisted entirely of in-state entities, from a tax that applied to another set of natural gas retailers, which included primarily out-of-state entities. The Court explained that the in-state retailers offered a "bundled" product, which consisted of not only natural gas itself but also myriad state-mandated protections for consumers to ensure (among other things) that their gas was not turned off due to temporarily missed payments and that all members of the public had access to gas service. See Tracy, 519 U.S. at 296-97. In contrast, the

out-of-state retailers sold "unbundled" natural gas, which did not come with any of the attendant state-mandated protections. Id. at 297.

The Court determined that the two types of retailers did not compete in what it described as a "captive" market -- consisting of individual consumers who required the protections offered with the "bundled" product. See id. at 301. It determined, though, that they did compete to some extent in a "non-captive" market for natural gas -- consisting largely of wholesale gas purchasers who did not require the "bundled" product's protections. See id. 302-03.

The Court then explained that the extent of the competition in the captive market was far from certain. See id. at 302. And it went on to explain that, in the face of that uncertainty, it was hesitant to disrupt the market for natural gas in Ohio by treating the two sets of retailers as "similarly situated."

The Court stressed its own limited capacity to understand precisely how the markets functioned, the differing nature of the products involved, and the harm that could come to consumers in the captive market, who were dependent on the bundled product, if the viability of that product was placed in jeopardy by the Court invalidating the preferential tax treatment at issue. See id. at 303-10. Accordingly, it rejected the claim of

discrimination by giving predominance to the lack of competition between the two retailers in the captive market (a market in which there could be no discriminatory effects), rather than to the existence of competition between them in the non-captive market (a market in which, in theory, there could be such effects).  See id. at 310.

The Court's rationale appeared to be that, because striking down Ohio's differential tax treatment might seriously harm the captive market in which the entities did not compete, while only benefitting the noncaptive market in which the extent of competition was limited and uncertain, the Court's intervention might have a negative impact on commerce overall.  As such, the judicial intervention "would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  Id. at 299.

Our final data point is a case that the Court decided a decade later: United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330 (2007).  There, the Court rejected a challenge brought by out-of-state private waste haulers alleging discrimination in favor of an in-state, municipally owned waste hauler.

The two entities offered the same service, so the case did not, strictly speaking, implicate the "similarly situated"

inquiry that Tracy requires when alleged competitors offer different products or services. But the Court did address whether the private entities and the government-owned entity were "similarly situated," id. at 343 (quoting Tracy, 519 U.S. at 313 (Scalia, J., concurring)), and it concluded that they were not. It explained that, unlike private companies, "government is vested with the responsibility of protecting the health, safety, and welfare of its citizens." Id. at 342. It thus determined that it would "not make sense to regard laws favoring local government and laws favoring private industry with equal skepticism," because, while laws favoring in-state private entities over out-of-state private entities are "often the product of 'simple economic protectionism[,]' . . . . [l]aws favoring local government, by contrast, may be directed toward any number of legitimate goals unrelated to protectionism." Id. at 343 (quoting Wyoming v. Oklahoma, 502 U.S. 437, 454 (1992)).

The present case does differ from Tracy in one respect. If the allegedly discriminatory measure were removed here, there is no reason to be concerned that the relevant local entities -- hotels and inns in Bar Harbor -- would be unable to continue to serve even the market in which they do not compete with the relevant out-of-state entities, cruise lines. In other words, there is no reason to be concerned that local hotels and

inns would not be able to continue to serve the market for vacationers seeking only land-based lodging.

But this case still does share an important attribute with Tracy. And that is because the market in which the in-state and out-of-state entities do not compete (the one for vacationers seeking only land-based lodging) is substantial, while the market in which there is some evidence of competition (the one for vacationers seeking any lodging) is limited.

Moreover, unlike in Bacchus, we have no evidence that the local measure here was enacted on the understanding that it favored in-state competitors over out-of-state ones. Indeed, the record indicates that what was salient to Bar Harbor voters were the externalities associated with the fact that the cruise lines -- by virtue of their specific product -- require use of the town's piers in ways that local hotels and inns simply do not. Thus, as in United Haulers, there is a salient difference between the alleged competitors that weakens any inference that the challenged measure was "the product of 'simple economic protectionism,'" rather than "directed toward . . . legitimate goals unrelated to protectionism." 550 U.S. at 343 (quoting Wyoming, 502 U.S. at 454).

Given how this case is like Tracy and United Haulers, and different from Bacchus, we see no reason to stamp the Ordinance with the protectionist label. To do so, we would have to rely on

the most debatable of inferences, notwithstanding the Court's own seeming reluctance to find protectionism so easily. In addition, because of the rule of virtually per se invalidity that applies to discriminatory measures, such a lax approach to the "similarly situated" inquiry would risk casting doubt on the lawfulness of a potentially wide array of facially neutral local measures. Such an approach therefore would cast doubt on those measures whether or not they would survive the inquiry that, under Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970), a court usually must undertake to determine whether a facially non-discriminatory local measure violates the Dormant Commerce Clause -- namely, an inquiry into whether the burdens (if any) that the measure imposes on interstate commerce are clearly excessive in relation to the claimed local benefits that it secures. In that respect, the District Court did not miss the mark in pointing to the hypothetical scenarios drawn from National Pork in rejecting the discrimination claims if, by doing so, it sought to illustrate the concerning implications that a finding of discrimination based on practical effects in this case would have for so many others. See United Haulers Ass'n, 550 U.S. at 343 (cautioning that deeming private entities similarly situated to government-owned competitors "would lead to unprecedented and unbounded interference by the courts with state and local government").

**4.**

Thus, even assuming the cruise lines and the Bar Harbor hotels compete with one another for some tourists' commerce, we cannot conclude that they are similarly situated. It follows that we cannot conclude that the plaintiffs and the Pilots have met their burden to show that the facially neutral Ordinance nonetheless discriminates against interstate commerce. As a result, we affirm the District Court's ruling dismissing the plaintiffs' and the Pilots' discrimination-based Dormant Commerce Clause claims.

**D.**

The plaintiffs' and the Pilots' final challenge is to the District Court's rejection of their only Dormant Commerce Clause claim in which they acknowledge that they have the burden to show that the measure not only burdens interstate commerce but also does so in a way that cannot be justified. In the claim, the plaintiffs and the Pilots allege that the Ordinance cannot survive under Pike, in which, as we just previewed, the Court held that if a local measure "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden

imposed on such commerce is clearly excessive in relation to the putative local benefits."  397 U.S. at 142.[13]

The Court has made it clear that it is the plaintiffs' burden -- not the defendants' -- to show that a measure's adverse impact on interstate commerce is "clearly excessive" in this way. See N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 48 (1st Cir. 1984) ("[T]he burden of proving 'excessiveness' falls upon the [plaintiff], not the state." (emphasis omitted)).  And here, in rejecting the Pike-based claims, the District Court determined that the plaintiffs and the Pilots had not met their burden in that regard.

As we will explain, the District Court properly found that the Ordinance both imposed some cognizable burdens and yielded some of its putative benefits.  But, in concluding that the plaintiffs and the Pilots had not met their burden under the "clearly excessive" standard, it did not appear to account either for the substantial magnitude of those burdens or the potentially marginal nature of the benefits.  Nor did it address whether there were possibly less burdensome means of achieving the benefits,

---

[13] The plaintiffs cursorily suggest that the Ordinance should fail Pike at the outset on the ground that its burdens on commerce are not "incidental" within the meaning of Pike's test because "the barrier it erects to cruise ship visits [is] intentional." That argument is waived for lack of development. See Zannino, 895 F.2d at 17.

such as they were.  As a result, we vacate and remand for the District Court to reconsider the record in applying the Pike test.

**1.**

As to the "burden on interstate commerce" side of the ledger, the plaintiffs and the Pilots argue that the record shows that the Ordinance "effectively prohibits transportation by passenger vessel, and in so doing, denies most tourists the ability to visit Bar Harbor by cruise ship."  See, e.g., Ray, 435 U.S. at 179-80 (upholding regulation requiring ships to use tugboat escorts and noting that "the amount of oil processed at Puget Sound refineries has not declined as a result of the provision's enforcement"); Exxon, 437 U.S. at 127-28; Nat'l Pork, 598 U.S. at 385-86.  But, they argue, the District Court did not properly account for the magnitude of this cognizable burden on interstate commerce in then assessing whether it is "clearly excessive" in relation to the Ordinance's "putative local benefits."

The District Court did find that the "the Ordinance will likely cause visitation to Bar Harbor to decrease, thereby affecting interstate commerce," and that "[t]he 1,000-person limitation is a significant downshift from the passenger caps previously observed in Bar Harbor."  At least in the short term, moreover, the District Court found that the Ordinance was hardly trivial, as it was likely to cause an 80 to 90 percent drop in the volume of cruise passenger visitation compared to recent years.

This was so in large part, according to the District Court, because cruise ships would be "unlikely" to call at Bar Harbor if they were not able to disembark their entire complement of passengers on a single day.

The District Court further found that "[e]ven if visitation is eventually maximized under the Ordinance, the overall number of cruise ship passenger visits would be significantly less than the level of visitation experienced in 2022 and 2023 and less than a third of the level authorized under the recent MOAs." (Emphases added). And that finding accords with the District Court's separate finding that pre-Ordinance daily visitation regularly approached existing caps of 3,500 and 5,500 passengers per day depending on the season.

True, the District Court speculated that some cruise lines will adjust to the Ordinance by offering vessels with lower-berth capacities under 1,000. But, as the Pilots stress, "if other vessels have already disembarked 1,000 persons" into Bar Harbor on a given day, even "[a] vessel designed to carry fewer than 1,000 persons" would violate the Ordinance if it disembarked any of its passengers. Moreover, the District Court expressly found that no evidence suggested smaller "cruise ships" had the capacity or the demand to "approach the [new, 1,000-person] caps on a regular daily basis." And it did not find that passenger

vessels too small to qualify as "cruise ships" -- because they have less than 50 lower berths -- could pick up the slack either.

It is clear that, based on these findings, the District Court found -- as we conclude it was required to do on this record -- that the Ordinance would impose a cognizable burden on interstate commerce. In then accounting for that burden in assessing whether the Ordinance imposed a "clearly excessive" one, however, the District Court appears to have discounted the seeming magnitude of the burden that it found, as it merely described that burden as "uncertain" and "impossible to quantify," because "it is impossible to know exactly how many fewer visitors will travel to Bar Harbor." There is thus a seeming mismatch between the District Court's findings about the extent of the Ordinance's burdensome impact and the District Court's ultimate characterization of that impact. And our concern about that mismatch is increased by two other features of the District Court's analysis of the burdens on interstate commerce that the Ordinance imposes.

First, in describing the magnitude of the burden as merely "uncertain" and "impossible to quantify," the District Court stated that "it is to be expected that cruise enthusiasts intent o[n] reaching Bar Harbor will find a cruise line to carry them there," because "[s]ome cruise lines already offer suitable vessels [with berth capacities under 1,000] with Bar Harbor itineraries," and others "no doubt will adjust." Its own findings

indicate, however, that this adjustment will not do much to stem the significant reduction in cruise passenger volume that the Ordinance will cause. The previous voluntary caps allowed up to 3,500 or 5,500 cruise passengers to disembark into the town each day, depending on the season, and the District Court found that cruise lines regularly approached those caps. Yet, under the Ordinance, no more than 1,000 cruise passengers can disembark and come ashore in the town in a single day, all year round. Thus, the posited "adjust[ment]" does not appear to warrant the downplaying of the burden that the District Court appears to have considered proper.

Second, as the Pilots point out, the record contains evidence to support a finding that the "interconnected" character of the cruise industry means that Bar Harbor's decision to regulate cruise ship visitation in the manner that it has will "carry implications" as to the volume of cruise passengers coming ashore in other localities up and down the East Coast. Nat'l Pork, 598 U.S. at 399-400 (Roberts, C.J., concurring in part and dissenting in part) (explaining that a local measure's "sweeping extraterritorial effects" could constitute a cognizable "harm[] to the interstate market itself" if that market is so "interconnected" that one jurisdiction's regulation would "carry implications" even for parties who do not sell in that jurisdiction); see also id. at 405-06 (Kavanaugh, J., concurring in part and dissenting in

- 58 -

part).[14]  Yet, in characterizing the burden on interstate commerce, the District Court did not appear to acknowledge this burden on the volume of cruise visitors to other jurisdictions in New England and Canada that the Ordinance would impose.

In response, the defendants argue, in effect, that there is no reason for us to be concerned about these aspects of the District Court's "burdens" analysis.  That is so, they appear to contend, because, in fact, the Ordinance imposes no cognizable burden on interstate commerce at all, as it merely impacts the business model of high-berth cruise ships.  See Exxon, 437 U.S. at 127 (holding that the Dormant Commerce Clause does not protect a "particular structure or method[] of operation in a retail market"); Nat'l Pork, 598 U.S. at 385 (plurality op.) (same). In other words, they contend that the Ordinance will not affect the overall volume of interstate commerce, apparently because that volume will remain constant due to the competitive efforts of cruise lines operating lower-berth vessels and other transportation providers picking up the slack insofar as the cruise lines themselves do not adjust.

The District Court found, however, that cruise lines operating smaller cruise ships cannot "promptly replace[]" the "entire" share, Exxon, 437 U.S. at 127, of the cruise-visitation

---

[14] We do not understand National Pork to rule out this type of burden as being cognizable.

market currently held by lines operating high-berth capacity boats, or adjust their operations to "fill the void," Nat'l Pork, 598 U.S. at 385, left by the exit of high-berth ships. And, even if they desired to do so, they too would be in violation of the Ordinance, by virtue of that measure imposing its cap on the aggregate number of passengers who can disembark from any cruise ship over the course of a day. Nor is there any evidence in the record that, insofar as cruise visitation declines, other forms of visitation will concomitantly increase. So, this is not a case, like Exxon, in which the challenged local measure's impact is only on a business model, and not the volume of commerce.

## 2.

With respect to the "putative local benefits" side of the ledger, there is no merit to the Pilots' contention that the District Court clearly erred by relying on subjective accounts of cruise tourism's impact on the town and expressly rejecting as unhelpful contrary empirical studies. See Jennings v. Jones, 587 F.3d 430, 444 (1st Cir. 2009) ("District court determinations of credibility are of course entitled to great deference."). Nor is there any merit to the plaintiffs' contention that "reducing pedestrian congestion in the quest to obtain comparative tranquility is not a legitimate local public interest under Pike," (citation modified), because it "is simply too vague an interest to be applied with any consistency to Commerce Clause cases." See

Breard v. City of Alexandria, 341 U.S. 622, 640 (1951) (explaining in upholding a local measure under the Dormant Commerce Clause that "[t]he police power of a state extends beyond health, morals and safety, and comprehends the duty, within constitutional limitations, to protect the well-being and tranquility of a community" (quoting Kovacs v. Cooper, 336 U.S. 77, 83 (1949))).

There is force, though, to the plaintiffs' and the Pilots' contention that there are other deficiencies in the District Court's assessment of the degree to which the Ordinance yields what Pike termed a local measure's "putative local benefits," 397 U.S. at 142. As we noted at the outset, the District Court found that, to the extent that the Ordinance would have any beneficial impact on public safety, that impact would be confined to the waterfront area. Even in that area, it found that there was no evidence to suggest that there had ever been a failure to deliver public services caused by cruise-passenger congestion. So, it would appear that if there are more than marginal benefits from the measure, then they must stem from the Ordinance's role in advancing the town's interest in reducing congestion. As the plaintiffs and the Pilots contend, however, the District Court's assessment of the Ordinance's congestion-reducing impact contains a significant gap when it comes to whether there are such non-safety-related benefits.

The gap pertains to the seeming disjuncture between the congestion-reducing benefits that the Ordinance appears to have been intended to yield and the benefits that the District Court found that it would yield. The Initiative's official Statement of Purpose identified a particular concern with congestion in the "downtown area" of Bar Harbor: "The large numbers of passengers have overwhelmed the downtown area, resulting in excessive congestion and traffic on public streets and sidewalks, frequent overcrowding of parks and other public spaces, and inundating local amenities and attractions." (Emphasis added). The District Court does not appear to have found, however, that the Ordinance advances any interest the town has in sparing that "area" of congestion in any substantial way.

> The District Court explained that:
>
> Cruise ship passengers come ashore in an area of limited space nestled between the Public Pier and Harborside Hotel. One of the piers over which cruise ship passengers travel sits at the east end [of] the harbor, adjacent to the Public Pier, near the juncture of Main Street and West Street. The other pier sits at the west end of the harbor. Between them is a short stretch of commercialized waterfront along West Street.

It then found that the impact of congestion resulting from cruise passengers was most "marked" at this "relatively confined waterfront area," which apparently includes "West Street and lower Main Street."

- 62 -

Notably, the "waterfront area" appears to be part of, but not the whole of, what witnesses and the District Court refer to as Bar Harbor's "downtown." This conclusion is buttressed by Sidman's testimony expressing his concern with cruise-based congestion insofar as it impacts his art gallery, which appears to have been located at all relevant times outside the "relatively confined waterfront area." Another defense witness too suggested that the waterfront area was but one part of Bar Harbor's downtown.

For present purposes, this apparent fact about Bar Harbor's downtown is of import because the District Court acknowledged that, beyond the "waterfront" area, the "spillover" impact of cruise passengers on congestion in the rest of the town was not seemingly as substantial. To that point, the District Court found that the impact on congestion was best described as "cumulative," though "real and tangible to locals who visit the downtown" "even further up Main Street and in public areas."

The District Court does not appear to have grappled with this divergence between its findings about the Ordinance's seemingly substantial impact on congestion occurring only in the waterfront and the Ordinance's apparent focus on relieving congestion in the downtown area more broadly. For example, the District Court's findings do not suggest either that the Ordinance would relieve congestion in more than a modest way in any area of Bar Harbor beyond the waterfront area or that the Ordinance's

salutary impact on congestion in the waterfront area would itself have an impact that made the Ordinance's role in achieving the claimed local benefits more than marginal. And, we note, this gap in the findings is manifest even though the District Court relied heavily on the need to defer to the judgment of Bar Harbor's voters in its ultimate Pike balancing.

To be clear, we do not agree with the Pilots that this concerning divergence renders "illusory" the Ordinance's "putative local benefits." Nor do we mean to suggest that, if the Ordinance solely or principally improved congestion at the waterfront but not the rest of downtown, that the Ordinance could not be understood to meaningfully advance a legitimate local purpose. But we do agree with the plaintiffs and the Pilots that the District Court's failure to grapple with the divergence kept it from making a meaningful finding about the magnitude of the benefits attributable to the Ordinance. For, while it did find that the Ordinance would yield some of its "putative local benefits," it did not make clear how substantially it would do so.

**3.**

Our concerns about the District Court's analysis of, on the one hand, the Ordinance's burdens, and, on the other, its benefits, take on significance when we consider the District Court's analysis of the ultimate question under Pike: Is the Ordinance's burden on interstate commerce "clearly excessive" in

relation to its "putative local benefits?" 397 U.S. at 142. The District Court's apparent failure to fully credit the Ordinance's volume-based burdens led it seemingly to understate the weight to be placed on the "burden" side of the Pike ledger. And its failure to grapple with the disjuncture between the measure's waterfront-focused benefits and the Initiative's broader downtown-focused purpose kept it from addressing whether the Ordinance yielded a meaningful reduction in congestion in such a limited area that it did so in a manner that yields only marginal "putative local benefits."

The upshot is that the District Court appeared to have been weighing only what it understood to be the Ordinance's "uncertain" burden on commerce against what it understood to be the Ordinance's "commensurabl[e]" benefit in reducing congestion, "particularly at the waterfront." (Emphasis added). As a result, it has not explained why, if the Ordinance's benefits are principally confined to the waterfront, we should nonetheless understand those benefits to be substantial enough to find the Ordinance's burdens less than clearly excessive.

This gap in explanation is especially concerning given the significant burdens on interstate commerce that the District Court's findings indicate that the Ordinance imposes. Cf. N.H. Motor Transp. Ass'n v. Town of Plaistow, 67 F.3d 326, 333 (1st Cir. 1995) (upholding a nighttime curfew preventing trucks from

accessing a single trucking terminal "during six late-night hours . . . with lesser restrictions for three hours" because "there [was] no indication that customers cannot be served from other terminals or that the flow of commerce into and out of New Hampshire [was] seriously affected"); Young v. Coloma-Agaran, No. CIV.00-00774HG-BMK, 2001 WL 1677259, at *11, *15 (D. Haw. December 27, 2001) (holding that a ban on all commercial vessels, save for kayaks, in Hanalei Bay imposes an unduly excessive burden on interstate commerce). After all, "the Court has been most reluctant to invalidate under the Commerce Clause 'state legislation in the field of safety where the propriety of local regulation has long been recognized.'" Raymond Motor Transp. Inc., 434 U.S. at 443 (quoting Pike, 397 U.S. at 143)). But, as we have explained, the District Court found that cruise-based congestion provides no cause for concern over public safety anywhere other than the waterfront and that, even in that area, "there does not appear to be an incident [to date] illustrating any past failure in the delivery of public services occasioned by passenger congestion."

The District Court's explication of the disembarkation process in Bar Harbor provides a further reason to deem incomplete its assessment of whether the Ordinance's burdens on interstate commerce are "clearly excessive." The record shows that cruises anchor at the anchorage grounds in Frenchman Bay, up to two miles

from the waterfront piers at which passengers come ashore in the town. From those anchorages, passengers are ferried to Bar Harbor's waterfront piers by tender vessels, each of which is "licensed to hold 149 passengers." Those vessels then "steadily rotate into and out of the harbor [ferrying cruise passengers] in roughly 30-minute intervals."

It thus appears that passengers arrive at the waterfront area in groups of up to, but not more than, 149 people at one time, with some number of minutes between each group of new arrivals.[15] The situation at the waterfront is not as dire, then, as one might expect were a high-berth cruise's full complement of passengers to disembark and come ashore in that area at any single point in time. And so, it seems possible -- as the plaintiffs and the Pilots urge -- that the Ordinance's benefits, both with respect to congestion at the waterfront and in the broader downtown area, could have been achieved via less burdensome means, such as voluntary cooperation with cruise lines, traffic management, or less restrictive caps. But the District Court did not examine whether these less burdensome means could have yielded much or all of the benefit achieved by the Ordinance. See Pike, 397 U.S. at 142; see also Great Atl. & Pac. Tea Co., Inc. v. Cottrell, 424 U.S. 366, 373 (1976) ("Inquiry whether adequate and less burdensome

---

[15] The plaintiffs twice alerted the District Court to this fact in their post-trial brief.

- 67 -

alternatives exist is, of course, important in discharge of the Court's task of accommodation of conflicting local and national interests, since any realistic judgment whether a given state action unreasonably trespasses upon national interests must, of course, consider the consequences to the state if its action were disallowed." (internal quotation marks omitted) (quoting Noel T. Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1, 22 (1940))); Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 473-74 (1981) (evaluating under Pike whether suggested alternatives would be "more burdensome on commerce" or "less likely to be effective" as compared to the challenged law).

Finally, we emphasize that we are not faced here with a typical capacity restriction of the kind a locality might impose on the total number of people who can take advantage of an amenity -- like a pool or park -- at one time. The Ordinance targets only visitors who arrive at Bar Harbor by cruise but imposes no limits on those who arrive using other instrumentalities of commerce. And the Ordinance is not limited only to the time in which the process for disembarkation must take place, such that it is targeted to address crowding on the piers in particular. Rather, it is focused on addressing the effects on congestion in the downtown, where the record indicates persons arriving by means other than cruise ships are themselves significant contributors. The District Court did not appear, however, to factor in these

aspects of the way in which the Ordinance operates in determining that it imposes no "clearly excessive" burden on interstate commerce in relation to its "putative local benefits."

**4.**

We are mindful that, as the District Court emphasized, the voters of Bar Harbor "weigh[ed] the relevant 'political and economic' costs and benefits for themselves." (Alteration in original) (quoting Nat'l Pork, 598 U.S. at 382). There are certainly reasons for courts to be wary of second-guessing such assessments of seemingly incommensurable things. How much of a reduction in local congestion must there be to warrant a locality's action that will reduce cruise ship traffic in Bar Harbor and beyond?

The District Court thoughtfully engaged with that question and its admittedly somewhat imponderable quality. It also did so after comprehensively reviewing the events that led to the Ordinance's adoption and carefully making various findings about its impacts. Even still, we cannot agree that the residents' own weighing of what the District Court termed "the intimate 'nature of the local interest[s],'" (alteration in original) (quoting Pike, 397 U.S. at 142), suffices in and of itself to demonstrate that the burdens that the record shows that the Ordinance imposes on commerce are not "clearly excessive" in relation to the measure's "putative local benefits." See Kassel,

450 U.S. at 670-76 (plurality opinion) (rejecting deference to "legislative judgment" where a local measure does not meaningfully achieve the purpose for which it was passed and where "the local regulation bears disproportionately on out-of-state residents and businesses"); cf. S. Pac. Co., 325 U.S. at 767 n.2 ("In applying [the Dormant Commerce Clause] the Court has often recognized that to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected."). Nor can we agree that, on this record, the Ordinance may be deemed not to be clearly excessive based on a determination that its "uncertain" burdens on interstate commerce are "commensurable" to its "putative local benefits."

We thus vacate the judgment dismissing the plaintiffs' and the Pilots' Pike-based claims and remand the case to the District Court. That way, the District Court may evaluate in the first instance whether the burdens on interstate commerce here are "clearly excessive" in relation to the "putative local benefits" after doing what it has not yet done. Accordingly, on remand, the District Court must expressly account, as to burdens, for the extent to which its findings show that the Ordinance (1) restricts the volume of tourists able to reach Bar Harbor by virtue of the Ordinance's cap limiting the total number of passengers

disembarking and coming ashore from any cruise ships in a single day, and (2) burdens other coastal towns by reducing the volume of cruise tourism to those jurisdictions. Moreover, as to benefits, the District Court must make clear findings regarding the extent to which the Ordinance (1) meaningfully advances Bar Harbor's interest in lessening congestion, with an eye toward whether the Ordinance does so in regard to the types of congestion that ultimately motivated Bar Harbor's residents to pass the Initiative, and (2) produces such local benefits that could not ultimately be achieved through less burdensome means. See Maine v. Taylor, 477 U.S. 131, 144-45 (1986) (explaining that "the empirical component" of scrutiny under the Commerce Clause, "like any other form of factfinding, is the basic responsibility of district courts, rather than appellate courts" (citation modified) (quoting Pullman-Standard v. Swint, 456 U.S. 273, 291 (1982))); id. at 146 (holding the same with respect to whether "alternative means could promote this local purpose as well" as the challenged measure (quoting Hughes, 441 U.S. at 336)); Kassel, 450 U.S. at 671-74, 678 (plurality opinion) (describing deference to lower-court fact-finding as to the extent to which a measure advanced its purported local purpose); cf. Town of Southold v. Town of East Hampton, 477 F.3d 38, 49-52 (2d Cir. 2007) (reversing grant of summary judgment where questions of fact remained as to

the burdens and benefits under <u>Pike</u> of a local ordinance barring certain ferries from landing in town).

**VII.**

For the foregoing reasons, the judgment of the District Court is **<u>affirmed in part</u>** and **<u>vacated and remanded in part</u>**.  In addition, the appeal is **<u>dismissed in part</u>**, while the cross-appeal is **<u>dismissed</u>**.  The parties shall bear their own costs.

**- Concurring Opinion Follows -**

**KAYATTA**, **Circuit Judge**, **concurring**.  I am dubious about my colleagues' apparent belief that a finding of "a pronounced impact on and near the waterfront," Ass'n to Pres. & Protect Loc. Livelihoods v. Town of Bar Harbor, 721 F. Supp. 3d 56, 69 (D. Me. 2024), does not jibe with the voters' concern about congestion in Bar Harbor's "downtown area," id. at 72, which plainly includes the waterfront.  I nevertheless agree that clarification of details like this can best be done by the able district judge in the District of Maine.